Grafton, }
Nov. 3, 1903. }

## WILLIAMS *& a.* v. PARK *& a.*

A plant designed for generating and distributing electric light and power is not a "manufacturing establishment," within the meaning of section 11, chapter 55, Public Statutes.

Where the vote of a town exempting from taxation an electric light and power plant is so connected with the exemption of a manufacturing establishment that the two cannot be separated and treated independently, the entire vote must be regarded as unauthorized and void.

PETITION, for *mandamus* requiring the selectmen of Warren to assess a tax upon property of William R. Park for the year 1901. The plaintiffs are residents and taxpayers in the town, and three of the defendants were the selectmen of the town that year. Park is the other defendant. Facts agreed, and case transferred from the May term, 1902, of the superior court by *Young*, J.

At a meeting duly warned, held October 9, 1899, the town, under sufficient articles in the warrant, voted as follows: "The establishment—that said establishment shall include a sawmill and dressing mill—for manufacturing lumber and wood, and furnishing steam and electric power and light and distributing the same, proposed to be erected and put in operation in the village of Warren by William R. Park, and the capital to be used by him in operating the same, not exceeding thirty thousand dollars, shall be exempted from taxation for the period of ten years. *Provided*, that said Park shall invest and expend not less than three thousand dollars upon and in his said proposed establishment in the village of Warren; and *provided*, further, that said Park shall give in to the town of Warren all personal property not hereby exempted—on the first day of each April for the purpose of taxation in said Warren."

Park, relying upon the vote, erected in the village of Warren, at an expense of more than $3,000, an establishment consisting of a sawmill and dressing mill for manufacturing lumber and wood, and sufficient room, power, and shafting for generating and furnishing steam and electric power and light and for distributing the same, but installed therein no dynamo or other appliances for collecting and distributing electric currents. The sawmill and dressing mill have been put in operation, and Park offers to show that he has always been ready and willing to install the electric plant, but has not done so because the town or its officers have not requested him to do it, and the selectmen have requested him

not to do it until it was ascertained what power and light were required.

Park was a resident of Warren, April 1, 1901, and had in the town this mill plant worth not less than $10,000, logs to be manufactured into lumber at the mill worth not less than $21,000, and other taxable property of the value of $16,034. He also owned several horses which then were, and for several months prior to that date had been, employed in his lumbering business in the town of Benton, and logs then in Benton and other New Hampshire towns where they were cut. He gave in to the selectmen of Warren, for taxation, all his personal property taxable in that town (except the logs therein), and the horses and logs which were in other towns. The selectmen taxed him upon $16,034 worth of property; and though requested by the plaintiffs, did not tax him for the mill and the logs in Warren because of the vote of the town, nor for the horses and logs in other towns because of their liability to taxation in the towns where they were located.

*Batchellor & Mitchell* and *Smith & Smith*, for the plaintiffs.

*Burleigh & Adams*, for Park, on motion for rehearing.

1. What is manufacturing? Dictionaries, encyclopædias, and other technical authorities may furnish definitions that will materially aid in its solution, but are not of controlling weight. The application of common sense, every-day experience, and knowledge of modern industrial conditions, which are understood to be a part of the judicial equipment of every court, is likely to afford the most satisfactory answer to this question; and it is in the opinions of the bench that we find the most luminous discussions and clearest definitions of this subject. For a collection of these authorities and a discriminating discussion of the same, we refer to 19 Am. & Eng. Enc. Law (2d ed.) 922–926, and 12 *Ib.* 345–351. From these authorities, definitions, and discussions, together with the experience, common knowledge, and common sense which the court properly bring to the judicial consideration of the subject, the following are plainly deducible as the distinguishing and essential elements of manufacturing. First, human agency, involving superintendence, skill, and labor, one or more of them, in every case. Second, the employment of certain processes or devices, mechanical, chemical, or otherwise, or the artificial manipulation or combination of natural forces, in a way to produce a commodity for commercial use, as distinguished from the free gifts of nature, or things in their natural state, such as sunshine, air,

water, fruits, vegetables, animals, natural oils and gases, wood, timber, coal, minerals, metals, ice found on ponds, etc.

The liberation of natural gas or oil from the earth and its transportation to market is held not to be manufacturing, but the collection and distribution of a natural product (*Emerson* v. *Commonwealth*, 108 Pa. St. 111), while the making of artificial illuminating gas is held to be a manufacture. *Covington Gas Light Co.* v. *Covington*, 84 Ky. 94; *Consolidated Gas Co.* v. *Baltimore*, 62 Md. 588; *Nassau Gas Light Co.* v. *Brooklyn*, 89 N. Y. 409. Ordinarily, a butcher who merely slaughters animals and sells the dressed meat would not be a manufacturer; but where one purchases swine, and uses certain processes and combinations of other materials whereby the carcasses are converted into bacon, lard, and cured meats for commercial use, he is taxable as a manufacturer. *Engle* v. *Sohn*, 41 Ohio St. 691; *People* v. *Roberts*, 20 N. Y. App. Div. 521. The cutting, storing, and selling of ice from a natural pond is generally held not to be a manufacturing business (*Hittinger* v. *Westford*, 135 Mass. 258; *People* v. *Ice Co.*, 99 N. Y. 181); but the artificial production of ice by mechanical or chemical process is a manufacture. See, also, *Dudley* v. *Aqueduct Corp.*, 100 Mass. 183; *Carlin* v. *Assurance Co.*, 57 Md. 515; *Lawrence* v. *Allen*, 7 How. 785.

2. The product of an electric power and light plant is "electrical energy," a commodity of commerce artificially made by a complicated mechanical process, which can be as accurately measured as a gallon of molasses, as readily distributed on wires as gas or oil is in pipes, and as easily stored and transported in jars as kerosene is in barrels. Whatever imponderable and unanalyzed properties it may have and whatever its ultimate essence may be, or however technically named, it is a manufactured article, and not a gift or product of nature.

The conception of the "electrical energy" commonly called "electric light and power," which Park's establishment was to furnish and distribute, as disclosed in the opinion, would seem to be that of some vast reservoir of electricity in the earth or skies, or in both places, constantly on tap, and to be drawn from *ad libitum*, as Franklin drew sparks from the clouds with his kite and key, or as one might draw a mug of cider from a forty-gallon cask. The fact is, however, as universally attested by scientific authorities and the actual experience of all who have had the subject under careful observation and treatment, that there is no such thing used, distributed, or sold, as a commercial commodity, as electricity in its natural state. The wide distinction between electricity in nature and the commercial article is generally recognized by the courts also, as will appear in the cases cited.

In *People* v. *Wemple*, 129 N. Y. 543, the court say: " If the question, whether a corporation engaged in the business of furnishing electricity for lighting public and private places or for power is a manufacturing company, was made to depend upon the meaning of these words as found in dictionaries, or upon the technical language of science in describing electricity as a power or as an agent in nature, it would doubtless be difficult and perhaps impossible to show that the process which the relator calls manufacturing produces what in a certain sense and in some form did not exist before. . . . The true inquiry would seem to be whether a corporation organized as this is, and carrying on the business that this does and in the manner shown, would not be considered in common language as engaged in some manufacturing process, or carrying on some manufacturing business, though granting all that is said by experts and others about electricity as a natural element or force. To say that electricity exists in a state of nature, and that a corporation engaged in the business that the relator is collects or gathers it, does not fully or accurately express the process by means of which it is enabled to sell and deliver something useful and valuable to its customers. The business in which the corporation is engaged renders it necessary, in the first place, to invest a large amount of capital in a plant, which may appropriately enough be called a factory. Then it must purchase and consume a vast amount of coal to produce steam and to furnish power for the operation of machinery. Then it supplies and operates a complicated system of machinery, such as boilers, engines, dynamos, shafting, belting, and such other things as are commonly used in manufacturing establishments; and then by means of wire, cables, and lamps it lights streets and private houses by electricity for a compensation. But the electricity or electric currents that produce these results cannot properly be said to be the free gift of nature, gathered from the air or the clouds. It is the product of capital and labor, and in this respect cannot be distinguished from ordinary manufacturing operations. . . . Passing by the refinements of scientific discussion as to the nature of electricity, it would seem to be common sense to hold that a corporation that does all this is, in every just sense of the term, a manufacturing corporation. . . . If due weight is given to the fact that electricity, as now used and applied to the business of life, such as the lighting of streets and buildings, the propulsion of cars and machinery, and like operations, is essentially the product of the skill and labor of man, there is no difficulty in reaching the conclusion that a corporation engaged in the business of generating, storing, transmitting, and selling it is . . . a manufacturing corporation."

See, also, *Edison Co.* v. *Power Co.*, 82 Me. 464; *Commonwealth* v. *Power Co.*, 145 Pa. St. 105; *Commonwealth* v. *Power Co.*, 170 Pa. St. 231; *Commonwealth* v. *Power Co.*, 193 Pa. St. 245; *Beggs* v. *Illuminating Co.*, 96 Ala. 295; *Lamborn* v. *Bell*, 18 Col. 346.

3. The fostering care of particular infant industries, the solicitude for commercial growth, the success of agriculture, the accumulation of wealth and its retention among the people, the proficiency of our mechanics and artisans, and a home field for their activities, has been the public policy of our legislators from the eighteenth century down to the present time. This is demonstrated by the numerous exemption laws passed since 1786, the preambles to the same, and the legislative purpose of their enactment as expounded by the court from time to time. The legislature originally began by singling out for exemption particular kinds of manufacture, and continued to expand the list until, by the act of 1871 (Laws 1871, *c.* 25, *s.* 1), towns were given power to exempt establishments for the manufacture of "fabrics of cotton, wool, wood, iron, or any other material."

The court's interpretation of this statute excludes from tax exemption all establishments which manufacture commodities in a liquid or gaseous form, as well as electric light and power plants; in short, every kind of manufacturing establishment except those which produce goods in a solid form. We are aware of no decision by our court in which this restrictive view has ever been taken, and it is altogether out of harmony with the manifest, persistent, and uninterrupted trend of legislative intent from 1786 to the present time, to extend and enlarge, and not to contract, the list of industrial exemptions. The legislature for many years dealt with the exemption of manufactures in a specific manner, passing its judgment in each case upon the merits of exempting a particular kind of manufacture or manufacturing establishment, or certain classes of manufactures and establishments. Finally after long experience had demonstrated the advantages of the policy when applied on a limited scale, the legislative purpose to extend the system to every branch of lawful manufacture, dependent, of course, upon the vote of each town, was embodied in the revision of the statutes of 1891, and found unmistakable expression in the phrase "any manufacturing establishment."

It would be a strange anomaly to so interpret this statute that a town could exempt from taxation an establishment making wooden toothpicks, but would be debarred from exempting an electric light and power plant upon which its whole system of lighting and transportation and all its other manufacturing industries depended. The term, "any manufacturing establishment" was used in the largest generic sense. The industrial develop-

ment of more than a hundred years, with its multitudinous inventions, mechanical devices, and ever-increasing varieties of manufacture, had demonstrated the wisdom and convenience of the most comprehensive enactment upon the subject of industrial tax exemption. The language in question was intended to be broad enough to cover not only every species of lawful manufacture that existed in the state, but any new ones that human invention and enterprise might introduce.

4. If the court adhere to the opinion that an electric light and power plant is not a manufacturing establishment, such finding does not invalidate the vote of the town so far as the sawmill and dressing mill are concerned. It is well settled that where lawful and unlawful exemptions are included in the same vote, and from their nature or situation are severable, the lawful part is sustained, and only the illegal part is held invalid. In such case a proper apportionment of the taxes is made between the property that is exempt and that which is not. As this principle seems to be challenged in the opinion of the court, we call attention to the following cases: *Opinion of Justices*, 4 N. H. 565; *Smith* v. *Burley*, 9 N. H. 423; *Opinion of Justices*, 45 N. H. 590; *East Kingston* v. *Towle*, 48 N. H. 57; *Dow* v. *Railroad*, 67 N. H. 1; *State* v. *Jackson*, 69 N. H. 511; *Fisher* v. *McGirr*, 1 Gray 1; *Commonwealth* v. *Mann Co.*, 150 Pa. St. 64; *Commonwealth* v. *Brake Co.*, 151 Pa. St. 276.

It is said in the opinion of the court: "It is not possible to ascertain whether the vote would have been adopted if it had not provided that both kinds of business should be carried on at the establishment. Some of the voters may have been induced to favor the scheme by the provision of an electric light and power plant, and would have voted against it in the absence of such promise," etc. We are unable to reconcile this language with the principles of construction promulgated by the foregoing authorities and sanctioned from time immemorial by the courts and text-book writers everywhere. This novel rule of interpretation abolishes all the salutary presumptions with which the courts have for hundreds of years fortressed the acts of legislative bodies and the votes of municipal corporations. Applying it to such acts and votes, how could any of them stand which embraced an illegal feature, for how would it be possible to ascertain whether or not the "vote would have been adopted," or the act passed, had it not contained the illegal feature? Who could say that the single unconstitutional feature of a legislative act, otherwise valid, was not the moving consideration in the minds of enough members to secure its passage?

CHASE, J. The statute under which the town acted in making the exemption to Park reads as follows: "Towns may by vote exempt from taxation for a term not exceeding ten years any manufacturing establishment proposed to be erected or put in operation therein, and the capital to be used in operating the same, unless such establishment has been previously exempted from taxation by some town." P. S., c. 55, s. 11. The establishment contemplated by the town's vote was to be equipped for furnishing steam and electric power and light and distributing the same, as well as for manufacturing lumber and wood. It was a single establishment, designed for two independent purposes. While it is possible that a boundary line might be discovered separating the portions of the building and machinery used for one purpose from the portions used for the other, and that the capital might be appropriated in definite shares to the several purposes, it is not possible to ascertain whether the vote would have been adopted if it had not provided that both kinds of business should be carried on at the establishment. Some of the voters may have been induced to favor the scheme by the promise of an electric light and power plant, and would have voted against it in the absence of such promise. Others may have voted for it because they were particularly interested in having a lumber mill established in the town, and were willing to subsidize an electric plant in addition to the mill to secure their wish. See *Cox Needle Co.* v. *Gilford*, 62 N. H. 503. The provision for having a light and power plant is a material part of the vote, and cannot be separated from the other provisions and treated as void, leaving the latter in force. The action of the town covered both subjects indiscriminately, and must stand or fall as a whole. It therefore is a fundamental question in the case whether an establishment designed for furnishing and distributing such power and lights is a "manufacturing establishment" within the meaning of the statute.

In attempting to answer the question, it must be borne in mind that the policy of the state requires the taxation of property as a general rule. "Every member of the community has a right to be protected by it in the enjoyment of his life, liberty, and property. He is, therefore, bound to contribute his share in the expense of such protection, and to yield his personal service when necessary, or an equivalent." Bill of Rights, *art.* 12 ; Const., *art.* 5. "It will never be assumed that the government intended to release any part of the property entitled to its protection from the burden incident to such protection, and it is the duty of those who assert that claim to show it in language which can admit of no other conclusion ; and where doubt arises as to the meaning of the lan-

guage used which it is claimed confers the exemption, it will be construed most strongly against those who maintain the exemption." *Phillips Exeter Academy* v. *Exeter*, 58 N. H. 306, 307; *Boody* v. *Watson*, 63 N. H. 320, 321; *Kimball Carriage Co.* v. *Manchester*, 67 N. H. 483, 484; *Alton Bay Campmeeting Ass'n* v. *Alton*, 69 N. H. 311, 312. The burden is upon Park to clearly show that the legislature intended by the statute to authorize the exemption from taxation of an establisment like his.

"Any manufacturing establishment" is a phrase that may have a broad meaning; but was it used in the statute in its broadest sense? The earliest statutes specified the manufactures that were to have the benefit of exemption. Mills, etc., used for the manufacture of linseed oil (Laws, *ed.* 1792, *p.* 341), for slitting, rolling, or plating iron (*Ib., p.* 343), for the manufacture of sail cloth or duck (*Ib., p.* 347), and for the manufacture of malt and malt liquors (Laws, *ed.* 1797, *p.* 400), were exempted in the first decade after the adoption of the present constitution. By the act of June 18, 1819, the buildings, machinery, and capital of the Souhegan Nail, Cotton & Woolen Factory, not exceeding in value $30,000, were exempted for a term of ten years. 7 N. H. 310. The preamble of the first act states the reason of its adoption as follows: "Whereas the manufacturing of oil from flaxseed, within this state, will furnish employment for poor persons, have a happy influence on the balance of trade, and greatly contribute to the wealth of the good subjects of this state: Therefore, to encourage the same, Be it enacted," etc. The prevention of a drain of money from the state to foreign countries is given as the reason for the enactment of other statutes. The object of them all was to promote the increase, industry, and prosperity of the inhabitants of the state. A careful examination has not brought to notice any statute upon the subject passed between 1819 and 1860. In the latter year an act was passed "to encourage manufactures," by which the machinery and capital used for the manufacture of "fabrics of cotton or wool, or of both cotton and wool," might, with the assent of the town, be exempted from taxation for the term of ten years after the passage of the act,—the town's assent to have "the force of a contract, and be binding for the full term above specified." Laws 1860, *c.* 2361, *s.* 1. By the General Statutes, enacted in 1867, the term of the exemption was made a period not exceeding ten years, to be fixed by the town granting the exemption. In other respects the statute continued the same in substance, although its form was changed. G. S., *c.* 49, *s.* 9. It seems that prior to 1871 exemption was sought for other industries aside from cotton and woolen manufactures. In 1869, Littleton was specially authorized to exempt an establishment for the

manufacture of hoes, forks, shovels, or scythes. Laws 1869, c. 124, s. 1. Authority for the exemption of establishments generally engaged in such manufactures and the manufacture of fabrics from other materials was granted by the act of July 7, 1871. The subjects of exemption were described in this act as establishments for the manufacture of "fabrics of cotton, wool, wood, iron, or any other material." Laws 1871, c. 25, s. 1. Upon the compilation and revision of the statutes in 1891, the phrase "any manufacturing establishment" was substituted for "any establishment . . . for the manufacture of fabrics of cotton, wool, wood, iron, or any other material," but without an intention of changing the law. Comm'rs' Rep. P. S., c. 54, s. 11. "Manufacturing," then, in the present statute, is used in the sense of working materials into a fabric or structure for use, as, for example, cotton into cloth, iron into tools, wood into carriages, etc. This is the ordinary meaning of the word, and, independently of the light thrown upon it by the history of the statute, would be regarded as the meaning which the legislature attached to it. The question then resolves itself into this: Whether the collection and distribution of electricity, for purposes of power and light, are manufacturing within this sense of the word? Machinery and manual labor are required in the process, but this fact alone does not bring it within the meaning of the word. The product of the machinery and labor must be a fabric or structure made from materials of some kind.

It has not yet been discovered what electricity is. Sir Oliver Lodge, an eminent English scientist, said in a lecture delivered in 1880: "We cannot assert that it is a form of matter, neither can we deny it; on the other hand, we certainly cannot assert that it is a form of energy, and I should be disposed to deny it. It may be that electricity is an entity *per se*, just as matter is an entity *per se*." In a lecture delivered the present year, he seems to give assent to the theory that it is matter in a fourth state, consisting of something very much smaller than atoms,—"ultra-atomic corpuscles,"—which revolve about each other within atoms at tremendous speed. The knowledge of electricity thus far acquired certainly does not warrant one to speak of it as a manufacture. In common speech, an electric light and power plant is not spoken of as a manufacturing establishment. In enumerating the manufacturing industries of a town, the electric plant would not ordinarily be included. It is true that the collection of electricity is sometimes spoken of as manufacturing it; but in such cases other words are usually added, as generating, producing, supplying,— showing a consciousness that "manufacturing" does not correctly express the idea. Laws 1881, cc. 233, 237, 241; Laws 1887,

*cc.* 237, 243, 247, 287, 292. The charter of the Franklin Gas and Electric Light Company probably describes the process more nearly correctly by the words "produce, collect, and store." Laws 1887, *c.* 261, *s.* 3.

There is direct evidence that the legislature did not intend by this statute to authorize the exemption from taxation of electric light plants. By an act approved March 25, 1897, a vote of the town of Franconia, "exempting from taxation an electric light plant, to be established in said town," was made legal and valid. Laws 1897, *c.* 208. Of course, this vote would have been unnecessary if it had been understood that the general statute authorized the town to grant the exemption. If it be said that doubts existed whether the general statute authorized the vote, and the special statute was passed to remove them, the evidence in that view is scarcely less effective in establishing the proposition that the general statute does not authorize such exemption; for by the well established principle of law above mentioned, the doubts should be construed most strongly against the exemption.

A similar question has arisen in other jurisdictions, but the decisions are conflicting. In a recent Maryland case it was held that an electric light company does not carry on a "manufacturing industry," within the meaning of a city ordinance exempting from municipal taxation "the machinery and manufacturing apparatus of all manufacturing industries" located in the city. *Frederick etc. Co.* v. *Frederick,* 84 Md. 599. In New York it was held that such a company was a "manufacturing corporation," within the meaning of a statute exempting manufacturing corporations from taxation. *People* v. *Wemple,* 129 N. Y. 543. See, also, *Commonwealth* v. *Power Co.,* 145 Pa. St. 105; *Commonwealth* v. *Power Co.,* 170 Pa. St. 231; *Commonwealth* v. *Power Co.,* 193 Pa. St. 245.

The real question is: What was the intention expressed by the language of the legislature in this case? In view of the ordinary meaning of the terms used in the statute, the policy of the state, and the evidence furnished by the history of the legislation on the subject and the action of the legislature in the Franconia case, it does not clearly appear, to say the least, that the legislature intended to authorize the exemption of property of this kind. As exemption of the electric plant is so connected with the exemption of the other property mentioned in the vote that it cannot be separated and treated independently, the entire vote must fail and be regarded as unauthorized and void.

This conclusion renders it unnecessary to consider the question of the constitutional power of the legislature to authorize towns to exempt property from taxation, and the other questions argued

in the briefs. The petition should be granted so far as it relates to property situated in Warren.  *Boody* v. *Watson*, 64 N. H. 162.

*Case discharged.*

PARSONS, C. J., did not sit: the others concurred.