## In re I. RHEINSTROM & SONS CO.

### (District Court, E. D. Kentucky. June 16, 1913.)

1. BANKRUPTCY (§ 350*)—PRIORITIES—"MANUFACTURER"—CONSTRUCTION OF STATUTES.

Whether or not one is a "manufacturer," within the meaning of statutes exempting manufacturers or manufacturing establishments from taxation, or giving to employés or those furnishing materials priority of payment in case of insolvency, is to be determined by what was his principal business, and not by what are mere incidentals to it; and in making such determination the word should not be limited to its grammatical or etymological meaning, since by usage in course of time, and when used in such statutes, it has taken on a different meaning, which would seem to exclude one who simply makes by hand in a small way, and make it apply only to those who make by machinery on a considerable scale and who sell their product.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 882; Dec. Dig. § 350.*

For other definitions, see Words and Phrases, vol. 5, pp. 4346-4358.]

2. BANKRUPTCY (§ 350*)—PRIORITIES—"MANUFACTURE"—"MAKING."

Within the meaning of such statutes, a "manufacture" is a "making"; and while a change in the condition of existence of an article is never a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

making, a change in the article itself, as a result of treatment, labor, and manipulation, is always a making.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 882; Dec. Dig. § 350.*

For other definitions, see Words and Phrases, vol. 5, pp. 4292–4294, 4344–4346; vol. 8, p. 7716.]

3. BANKRUPTCY (§ 348*)—DISTRIBUTION OF ESTATE—DEBTS ENTITLED TO PRIORITY—"MANUFACTURING ESTABLISHMENT."

A bankrupt company purchased cherries grown in Greece and Italy, and imported preserved in brine and sulphuric acid, extracted the preservative, stemmed, pitted, sweetened, colored, flavored, and preserved them, and sold them as cherries; the product being what is commonly known as "Maraschino cherries," used as a garnish in drinks, ice cream, etc. *Held,* that it was the owner and operator of a "manufacturing establishment," within the meaning of Ky. St. § 2487, which gives a lien to employés of such establishments, and to those furnishing materials or supplies in the carrying on of their business, on the distribution of their property to creditors, and that creditors of such classes were entitled to priority of payment from the proceeds of the bankrupt's plant.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 870–877½; Dec. Dig § 348.*

For other definitions, see Words and Phrases, vol. 5, pp. 4346–4358; vol. 8, p. 7716.]

4. BANKRUPTCY (§ 348*)—PRIORITIES—CONSTRUCTION OF STATUTE—GENERAL AND SPECIFIC WORDS—MANUFACTURING ESTABLISHMENT.

In Ky. St. § 2487, which gives to employés and persons furnishing materials or supplies for the carrying on of the business of "any mine, railroad, turnpike, canal or other public improvement company, or of any owner or operator of any rolling mill, foundry or other manufacturing establishment," a lien on the distribution of the property among creditors, the words "manufacturing establishment" are not limited in meaning to iron manufacturers, but include manufacturing establishments of all kinds.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 870–877½; Dec. Dig. § 348.*]

In the matter of I. Rheinstrom & Sons Company, bankrupt. On review of order of referee. Reversed.

De Camp & Sutphin and Burch, Peters & Connolly, all of Cincinnati, Ohio, for petitioners.

Harmon, Colston, Goldsmith & Hoadly, of Cincinnati, Ohio, for Covington Savings Bank & Trust Co.

Lessing Rosenthal, Chas. Hamill, and Leo F. Wormser, all of Chicago, Ill., for Central Trust Co. of Illinois.

COCHRAN, District Judge. This case is before me on petition of eight creditors of the bankrupt, who claim priority over the other creditors under sections 2487 to 2491, inclusive, of the Kentucky Statutes, by virtue of section 64b (5) of the Bankrupt Act (Act July 1, 1898, c. 541, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3447]) for review of an order of the referee denying them such priority. The bankrupt owned and operated an establishment at Ludlow, Ky., in this district, where it produced what are known as "Maraschino cherries," and the debts of the petitioning creditors were for materials and supplies furnished for the purpose of carrying on its business. The provisions of those

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sections of the Kentucky Statutes under which priority is claimed may be found set forth in full in my opinion in the case of In re Bennett, 153 Fed. 680, 82 C. C. A. 531.[1]

The right thereto depends solely on the question whether or not the bankrupt was the owner or operator of a manufacturing establishment, within the meaning of section 2487. That is the only question which has been presented and argued before me. It is claimed by the trustee and creditors, other than petitioners, that it was not the owner or operator of such an establishment, and the referee so held. Under that section and section 2491, in certain contingencies, the employés of and persons furnishing, for the purpose of carrying on its business, materials and supplies to "any mine, railroad, turnpike, canal or other public improvement company," or "any owner or operator of any rolling mill, foundry or other manufacturing establishment," acquires a lien on its property and effects.

The position of the trustee and objecting creditors is twofold. They contend that the bankrupt was not the owner or operator of a manufacturing establishment at all, and that, if it was, it was not the owner or operator of the kind of a manufacturing establishment covered by the statute. They contend that it does not cover every kind of a manufacturing establishment, but only such manufacturing establishments as are like the two specified, to wit, rolling mill and foundry, and the bankrupt's establishment was not of such character. The referee based his holding on the first branch of the position; i. e. that the bankrupt's establishment was not a manufacturing establishment at all.

The problem in hand, therefore, is one of interpretation—the ascertainment of the thought of the Legislature of Kentucky as to the character of establishment necessary to bring the owner or operator thereof within the statute. What kind of an establishment did it have in mind when it used the words "other manufacturing establishment." Generally such a question is stated to be concerned with the intent of the Legislature or the spirit of the legislation. I prefer to put it as having to do with the thought of the Legislature.

It is urged on behalf of the respondents that this statute should be strictly construed. By this I understand to be meant that it must clearly appear that the bankrupt's establishment was such an establishment as the Legislature had in mind in enacting the statute; otherwise, the claim to priority should be denied. I accede to the sound-

[1] Section 2487 of the Kentucky Statutes (Carroll, 1909) provides:

"When the property or effects of any [mine], railroad, turnpike, canal or other public improvement company, or of any owner or operator of any rolling mill, foundry *or other manufacturing establishment,* whether incorporated or not, shall be assigned for the benefit of creditors, shall come into the hands of any executor, administrator, commissioner, receiver of a court, trustee or assignee for the benefit of creditors, or shall in any wise come to be distributed among creditors, whether by operation of law or by the act of such company, owner or operator, the employés of such company, owner or operator in such business, and the persons who shall have furnished materials or supplies for the carrying on of such business shall have a lien upon so much of such property and effects as may have been involved in such business, and all the accessories connected therewith, including the interest of such company, owner or operator in the real estate used in carrying on such business."

ness of this position, particularly as from my experience with it, in the Bennett Case, I have found that it is capable of working a very great hardship. In that case foreign materialmen, who did not know that they were entitled to priority until after bankruptcy, took the entire estate, and local banks, who, in like ignorance, had furnished money, not only to buy material, but to pay the employés, and by so doing had aided materially in keeping the concern on its feet for many months, went without anything. But if the bankrupt's establishment comes clearly within the statute, I have no other recourse than to sustain the claim to priority.

In the argument before me the last branch of respondents' position—i. e., that the Legislature did not have in mind any manufacturing establishment, but only such establishments as were like the two specified, and the bankrupt's establishment, assuming it to have been a manufacturing establishment at all, was not such an one—has been put to the front. It seems to me, however, that it is more logical to deal first with the other branch of respondents' position, assuming for the time being that the Legislature had in mind any such establishment, and I shall pursue that course. In so doing I think best at the outset to come to an understanding as to two matters. One is as to what bankrupt did at its establishment, and what were the so-called "Maraschino cherries" which it produced thereat. The other is as to respondents' argument in favor of the position that the establishment was not a manufacturing establishment.

What the bankrupt did at its establishment had to do with natural cherries in a certain condition. The cherries were large, white-meated, free-stone cherries. They had been grown in the north of Greece or Italy; then picked just before reaching the ripened stage—i. e., as they began to turn—with their stems attached; then treated with sulphuric acid to bleach them, the color produced thereby being white or light brown; and finally immersed in brine and a percentage of sulphuric acid in casks or barrels to preserve them, in which condition they were purchased by the bankrupt. There were ten distinct stages in what it did to them after they had been received at its establishment. It first drained off the brine and sulphuric acid; then washed the cherries in various changes of fresh water, to remove all traces of the brine and acid; then stemmed them by hand; then pitted them by machinery; then washed them again in various changes of fresh water to remove any brine or acid which might have gotten under the skin in stemming and pitting; then colored them by immersing them in a solution of coloring matter and water; then sweetened them, by immersing them in a syrup made of cane sugar and water, contained in a vacuum kettle within an open kettle containing water, and, whilst in this condition, keeping the water in the outer kettle hot for 12 hours, and then converting that kettle into a vacuum kettle, also, and keeping the water therein boiling for 24 to 48 hours, this operation being termed the "cooking" operation; then flavored them, by adding to the syrup such flavoring substance as might be desired; then sorted and graded them; and finally bottled them with the syrup thus flavored. It does not appear what was the original name of the cherries so pur-

chased and treated. It was not Maraschino. There is a cherry of that name grown in the mountains of Dalmatia in Austria, but they were not such cherries. Amongst the substances with which some of them were flavored was what was termed real "Maraschino water," made from the real Maraschino cherries, and with which others were flavored was what is termed "Marasque water," made from cherries grown in southern France, an imitation of the real Maraschino water.

The cherries so treated were given two colors, red and green. The red ones are characterized as luscious, big, red cherries, and up to the year 1911 had been labeled "Maraschino cherries," and that was the name by which they were popularly known. In that year, under the Pure Food and Drug Act, it was forbidden to so label them. Thereafter they were labeled simply as cherries. It was stated that they were artificially colored, and, if flavored with real Maraschino water, that also was stated. It is not likely that this change in the label has to any extent affected the name by which they are popularly known. It is testified that it has not affected their sale. The referee has put the bankrupt's connection with these articles, to which I have given so much detail, in a single sentence. He says:

"In short, the bankrupt bought cherries, preserved in brine and sulphuric acid, extracted the preservative, stemmed, pitted, sweetened, colored, flavored, and preserved them, and sold them as cherries."

The principal, if not only, use to which these cherries are put, is as a garnish in various mixtures of alcholic liquor, salads, ice cream, and deserts. Their flavor is not that of the original cherry, not even of the real Maraschino cherry.

The argument of respondents' counsel in support of the position that the bankrupt's establishment is not a manufacturing establishment hardly deals with the subject as a matter of principle. They rely or certain decisions, some from noncontrolling jurisdictions, and others from controlling jurisdictions. Those from controlling jurisdictions are by the Court of Appeals of Kentucky, the Sixth Circuit Court of Appeals, and the Supreme Court of the United States. It must be conceded that the decision of any of these three courts, if in point, is binding on me. I have no right to do otherwise than follow it, whether I deem it sound or not. I deem it important to make a rather full presentation of these decisions. Those from noncontrolling jurisdictions will be noted first.

Two decisions from the Supreme Court of Louisiana are much relied on. They arose under the Constitution of that state exempting manufacturers from a certain tax. They were in the cases of City of New Orleans v. Mannessier, 32 La. Ann. 1075, and City of New Orleans v. New Orleans Coffee Co., Ltd, 46 La. Ann. 86, 14 South. 502.

In the Mannessier Case it was held that one who produced ice cream in an establishment equipped with steam engines and other complicated apparatus, and with the aid of a large force of workmen, was not a manufacturer. In the course of the opinion it was said:

"We are told that any one seeing the steam engine, and complicated apparatus, and large force needed to produce defendant's goods, would at once conclude that he is a manufacturer. With as much force it might be said

that any one visiting the mammoth kitchen of the Grand Union Hotel at Saratoga, together with their myriads of employés, and their colossal apparatus, would at once magnify the cooks and pastrymen into manufacturers."

In the New Orleans Coffee Co., Ltd., Case it was held that a corporation which purchased green coffees, divided them, by a secret process, for the production of different brands, suitable to different tastes and recognizable from each other, roasted them carefully and cleanly, cooled them by another secret process, and in this condition put them on the market, was not a manufacturing corporation. It used no chemicals and did not grind the coffee. Judge Parlange said:

"We are satisfied that the defendant corporation does not claim that it is a manufacturer by reason of grinding coffee and thereby changing its form. * * * Its claim to be a manufacturer * * * is based wholly on the production of brands of unground roasted coffee. * * * We are to decide whether the defendant corporation is a manufacturer, on the tangible results of the manipulation to which they subject green coffees, bearing in mind the assertion of the defendant corporation that it uses no chemicals, and that the coffee after the manipulation is still pure coffee. The defendant corporation virtually admits that a 'coffee roaster' is not a manufacturer, but denies that such a designation can properly be applied to it. A 'coffee roaster' is testified by the witnesses for the defendant corporation to be a person 'who takes a sack of coffee and simply puts it in a roaster and turns that coffee out after it is roasted.'"

Again he said:

"It is not every employment of labor which will make the thing upon which it is employed a manufacture. It has been held that the great and laborious pursuits of mining and shipbuilding are not manufacturing occupations."

In referring to the ice cream case he said:

"In that case this court said that the mammoth kitchen of a hotel is not a manufactory, yet the confectionary and the kitchen yield products in which the identity of the articles from which they are made is almost lost."

In distinguishing the decision of that court in the case of In re Ernst, 35 La. Ann. 746, which arose between the case then in hand and the ice cream case, in which it was held that a rice miller was a manufacturer, he said:

"To clean rice, a long and laborious process is required; a large and expensive plant, including powerful and complicated machinery, is necessary; and from the 'paddy' several marketable by-products are obtained, beside the cleaned rice."

The first of the two decisions of the Supreme Court of the United States relied on and hereafter presented was cited in support of the position taken.

Then comes the decision of the Supreme Judicial Court of Massachusetts in the case of Hittinger v. Westford, 135 Mass. 258. It was there held that a steam engine, boiler, machinery, and tools used in houses located on the shores of two large ponds to cut and remove from the ponds and store in the houses ice, which formed on the ponds during the winter time, by a person who sold same at wholesale in large quantities for export and use in Massachusetts and other states was not machinery employed in a "branch of manufactures" under a tax statute. Judge Colburn said:

"The cutting of ice produced by the agencies of nature, on the surface of a pond, into pieces convenient for handling, and storing the pieces in a building, cannot in any proper sense be called a manufacture. The material is in no way changed, or adapted to any new or different use; it still remains ice; * * * it is no more a manufacture than the putting of the water from the pond into casks for transportation and use would be a manufacture, or the mining of coal, which has been decided not to be a manufacture. Byers v. Franklin Coal Co., 106 Mass. 131. It is like the harvesting of hay or grain, or other agricultural crops, and the analogy is so strong and obvious that the 'ice crop,' the 'ice harvest,' and 'harvesting ice' are terms in common use."

Then come three decisions of the Court of Appeals of New York in the cases of People v. Knickerbocker Ice Co., 99 N. Y. 181, 1 N. E. 669; People ex rel. Union Pacific Tea Co. v. Roberts, 145 N. Y. 375, 40 N. E. 7; People ex rel. New England Dressed Meat & Wool Co. v. Roberts, 155 N. Y. 408, 50 N. E. 53, 41 L. R. A. 228.

The Kickerbocker Ice Co. Case is just like the Massachusetts case first considered. It involved the question whether a corporation engaged in the business of collecting ice from the Hudson river and Richland Lake, storing, preserving, and preparing it for sale, transporting it to the city of New York, and vending it there, was a manufacturing corporation under a statute exempting such corporations from taxation. It was held that it was not. No reference was made to the earlier Massachusetts case. Judge Danforth said:

"Its dealing is with 'ice' as an existing article, not the manufacture or production of ice by combination of materials, or the application of forces, or otherwise. It collects, stores, and preserves that which natural causes created, and which other natural causes would destroy and waste. It seeks only to hold these last in check. Similar operations would equally apply to water, fruit, sand, gravel, coal, and other natural productions. Water might be improved by filtration, fruit by judicious pruning of the tree or vine, or protection by glass, sand and gravel by screening, cobble stones by selection, and coal by breaking, and each by various processes stored until the season of demand, when * * * the natural articles and no other would be put upon the market. No doubt ice may be manufactured and frigorific effects produced by artificial means. Corporations exist for that purpose and come literally within our manufacturing laws. Their methods in no respect resemble those of the defendant. Its tools and implements are for convenience in handling and marketing a product, and not at all for making it."

In referring to certain cases cited in support of the contention that the defendant was a manufacturing corporation, and in distinguishing them from the one in hand, Judge Danforth said:

"They all, so far as they have any application, require the production of some article, thing, or object by skill or labor out of raw material, or from matter which has already been subjected to artificial forces, or to which something has been added to change its natural conditions."

The Union Pacific Tea Company Case is like the Louisiana coffee case, but goes it one better. The question involved was whether a corporation which purchased tea in its original state, mixed various kinds together, and produced a compound which was called a combination tea, and purchased, also, coffee in the raw bean, roasted and ground it, and in some instances mixed different kinds of coffee together, forming, as in the case of tea, a combination article, was a manufacturing corporation, so as to be exempt from taxation. It was

held that it was not. Here the coffee was ground. In the Louisiana case it was not, and point was made of this in that case. Here, too, the first of the two decisions of the Supreme Court of the United States relied on and hereafter considered was cited as authority for the position taken, and the only authority relied on was its earlier decision in the ice case just considered. Judge Bartlett said:

"We think it very clear that the handling of tea and coffee in the manner indicated is not 'manufacture' in any legal sense, and the relator cannot be regarded as a manufacturing corporation. Mr. Webster defines 'manufacture' to be 'anything made from raw materials by the hand, by machinery, or by art, as cloths, iron utensils, shoes, machinery, saddlery, etc.' The process of manufacture is supposed to produce some new article by the application of skill and labor to the raw material. It is quite apparent that the processes of relator, when subjected to this test, cannot be deemed 'manufacture,' either in the ordinary or legal definition of that term."

The New England Dressed Meat & Wool Company Case involved the question whether a corporation operating a slaughterhouse was entitled to the exemption as a manufacturing corporation. The nature of the corporation's business was thus set forth by Judge Martin:

"Briefly stated, the principal business carried on by the relator was the purchasing of sheep and lambs, slaughtering them, pulling the wool from the hides or pelts, selling it, selling the hides, taking from the animals the offal, including the blood and legs, converting it into fertilizer, and then reducing the carcasses to a temperature which would retard decomposition, and shipping them to the place of delivery in refrigerator cars."

He stated the conclusion of the court in these words:

"We think this does not constitute 'carrying on manufacture' within the spirit and meaning of the statutes. The business conducted by the relator was obviously that of purchasing, slaughtering, and selling sheep and lambs. While it utilized the hides, the wool, the tallow, and the offal, as well as the carcasses of these animals, yet to say that refrigerated mutton, rendered tallow, pulled wool, or untanned hides were manufactured articles would be quite incorrect. The words of a statute are to be given their natural, plain, obvious, and ordinary signification. To say that the relator was engaged in manufacturing mutton, wool, hides, or tallow would not be giving to the words 'manufacture' or 'manufacturers' their ordinary and plain meaning. It may be that the fertilizer might be regarded as a manufactured article, but that was not the principle business in which the relator was engaged, but was a mere incident to it. Manifestly, none other of these articles was manufactured. At most, they were merely prepared for market and preserved until sold. We are clearly of the opinion that the relator was not a manufacturing corporation, nor engaged in 'carrying on manufacture' in this state, within the spirit and meaning of the statutes."

The only authorities relied on in support of the conclusion reached were the court's previous decisions in the natural ice and coffee cases heretofore considered.

Finally comes a decision of Judge Blatchford, just before his elevation to the Supreme Court Bench, in the case of Frazee v. Moffitt (C. C.) 18 Fed. 584. The question there involved was whether hay in bales imported from Canada was an "unmanufactured" article, or a "manufactured" article, within the tariff laws. It was held that it was an "unmanufactured" article. Judge Blatchford stated the contention of the defendant, who was claiming it to be a "manufactured" article, to be:

"That hay is a new article, transformed from grass, as much as sugar is from the cane juice or the maple sap, or as salt is from the saline brine, and that the heat of the sun, and the air, and human skill and labor, manufacture the grass into hay."

In answer to this contention he said:

"Many articles are properly called raw which have undergone some manipulation. Cotton is picked from the bolls, and cleaned by ginning, and baled. Yet it is raw cotton in the bale. Wheat is cut, and the grains are threshed out, and then subjected to a cleaning machine, and then bagged. Yet it is raw wheat in the bag. So with other grains. The cotton and the grains undergo such change and preparation as exposure to light, and natural or artificial heat, and air, and the manipulation they receive, produce or allow, be it more or less. Yet neither the cotton nor the grains would be said to be manufactured. Salt and sugar are new articles. Cotton and grains are the same articles they were when on the plant with its roots in the earth. So hay is the same article it was when it was stalks of grass with roots in the earth. It is dried, to be sure; but the drying and any conversion of starch into sugar are mere incidents of the necessary cutting to enable it to be stored for food in latitudes where grass cannot be found all the year around. Where it can be so found, no hay is stored. Dried apples would not be called a manufactured article, though the apple is peeled and cored and sliced, and dried by exposure to the sun and manipulation. The substance of dried apples is still apples. The substance of dried grass or hay is still grass. Change of name and manipulation do not necessarily constitute manufacture, within the meaning of section 2516. Each case must be decided according to its own circumstances."

These seven decisions are all that are cited and relied on coming from noncontrolling jurisdictions.

I come now to those from controlling jurisdictions. They are two from the Kentucky Court of Appeals, one from the Sixth Circuit Court of Appeals, and two from the Supreme Court of the United States. The Kentucky decisions are those in the cases of Muir v. Samuels, 110 Ky. 605, 62 S. W. 481, and Standard Tailoring Co. v. City of Louisville, 152 Ky. 504, 153 S. W. 764.

The Muir Case involved the question whether a laundry company was the owner or operator of a "manufacturing establishment" under the statute involved here. It was raised by certain laborers claiming a lien on the laundry under that statute. It was held that it was not. Judge Burnam said:

"The only business of a laundry is to transform soiled into clean linen. It is true that this is done largely by means of machinery, and requires the use of an engine and boilers, and other appliances ordinarily used in manufacturing establishments; but, after all, nothing new is produced."

He then cited the Massachusetts ice case and the Louisiana ice cream case, and concluded as follows:

"We are therefore inclined to the opinion that a laundry cannot be considered a manufacturing establishment in contemplation of the statute."

The Standard Tailoring Company Case was decided but recently. It involved the question whether that company operated a manufacturing establishment in the city of Louisville, so as to be entitled to exemption from municipal taxation for five years under an ordinance thereof granting such exemption to such establishments. The business in which the company was engaged was that of making up men's

clothing for the trade, pursuant to sales from samples distributed among local dealers. It was held that it was not a manufacturing establishment. Judge Carroll said:

"The words 'manufacturing establishment' have been given a variety of meanings, depending largely on the circumstances surrounding the case in which they have been used. The result of this is that, although the words have been often defined by the courts, few judicial precedents can be found that may be properly applied to any particular state of facts. Webster defines 'manufacture' to be: 'The process or operation of making wares or any material products by hand, by machinery, or by other agency; often such process or operation carried on systematically, with division of labor and with the use of machinery. Anything made from raw materials by the hand, by machinery, or by art, as clothes, iron utensils, shoes, machinery, saddlery.' And this definition in different forms of expression embodies the general idea that may be found in all the cases where the word has come up for construction; but, in applying it to the facts of particular cases in which the construction of ordinances or statutes was involved, the courts, especially in license and exemption cases, have found it necessary, in carrying out the legislative intent in the use of the word, to materially limit the scope of this general definition, which is broad enough to embrace almost every concern that is engaged in business of changing the nature or quality of articles, so that they may be used for whatever purpose they were intended. Indeed, we might say that the meaning of the words 'manufacture' and 'manufacturing establishment' has been adapted to meet the varying circumstances arising in the case or class of cases in which it was necessary to define them, so that the intent with which they were used might be accomplished. The purpose of the lawmaking body in using the words has always been allowed to have controlling weight in the decision of the meaning that should be attached to them, as may be seen by an examination of the number of cases cited in Words and Phrases, vol. 5, title 'Manufacture.' Keeping in mind, then, the purpose of this ordinance and the thought that the words should be given such meaning as was reasonably intended in their use, it must be at once manifest that, if this broad definition of Webster should be given to the words as used in this ordinance, there are few establishments, whether large or small, that are engaged in the business of converting material from one form into another, to make it more convenient or desirable for use, that would not be entitled to the benefit of the exemption. The baker, the blacksmith, the carpenter, the shoemaker, the confectioner, the merchant tailor, the milliner, the dressmaker, and scores of others, would escape taxation, although it seems quite obvious that it was not intended by the adoption of this ordinance to exempt from taxation the multitude of concerns that in some way or another are engaged in the business of changing the character of material from one form to another. To give the ordinance the construction contended for would defeat, in place of accomplish, the result intended in its adoption. which was to induce the location in the city of new manufacturing establishments, that would bring wealth into the city to increase its revenue when the period of exemption has passed, because the diminution in revenue by the exemption of the large class continually engaged in changing articles or material from one form to another would largely exceed the amount that might be produced as a result of the establishment of new manufacturing enterprises. Aside from this, it would work gross inequality in the system of taxation; for example, the merchant tailor and the shoemaker would be exempt from taxation, while their next-door neighbors, the clothing merchant and the dealer in shoes, would be taxed. So that, while conceding that under a liberal definition of the words the appellant company might be entitled to the exemption, we are sure that, when interpreted to carry out the legislative intent in granting the exemption, it does not bring itself within the fair or reasonable meaning of the ordinance, to the purpose of which reference would be constantly made in determining the class entitled to the favor of exemption. We may also with much propriety observe that it would not be either safe or judicious to attempt any more accurate definition of the words 'manufacturing establishments' than may be necessary to a decision of the

precise question before us. The meaning that should be given to these words may come up in other cases presenting entirely different states of fact, in which the meaning here ascribed to them would be both inappropriate and unjust, and therefore what we say upon the subject must be understood as referring directly to the question submitted in this record from our decision."

And again he said:

"Counsel for appellant undertakes to make a sound distinction between the business of a merchant tailor and the business the appellant company is engaged in. There is a difference in the amount of business they do and a difference in the manner of transacting it, but this is all. When a customer wishes to buy a suit of clothes from a merchant tailor, he goes to his place of business, selects the style of goods he wants, the tailor takes his measure, and manufactures, or makes, as you please, a suit of clothes for him out of the goods selected. When a man wishes to get a suit of clothes from the appellant company, in place of going to its business house, he goes to its agent, the country merchant, selects the kind of goods he wants, has the country merchant take his measure and send it to the appellant company, and it makes the suit of clothes as ordered. The merchant tailor probably has a dozen people employed in cutting and making clothes by hand and machine, while the appellant company claims to have 60 employés and a number of machines operated by electricity. Under this state of facts, if the appellant is entitled to the exemption, it would be clearly an unjustifiable discrimination to deny a like exemption to every merchant tailor in the city of Louisville, and, if the merchant tailor in the city were granted the exemption, no good reason could be assigned for not exempting all the milliners, all the dressmakers, all the bakers, all the confectioners, all the shoemakers, all the carpenters, and all the cabinet makers who have places of business in the city, and all other persons who are engaged in converting articles from one form into another: and yet we think it apparent that the most ardent champion of giving this ordinance a liberal construction would not think of extending it to embrace merchant tailors, dressmakers, milliners, and the like."

He cited the Louisiana ice cream case, and the court's decision in the laundry case, and also the decision of the Supreme Court of Montana in the case of Montana v. Johnson, 20 Mont. 367, 51 Pac. 820, involving the question whether a merchant tailor was a manufacturer. He quoted from the opinion in that case these words:

"A 'manufacturer' is one who makes or fabricates anything for use, and within the literal definition of 'manufacturer' would come a tailor who works clothes into suits for wear. So, too, a seamstress would be brought within such a definition, for she makes handkerchiefs from linen; and the carpenter, who takes raw lumber prepares it for building a house; and a milliner, who makes and sells bonnets; and a blacksmith, who makes horseshoes or forges iron; and the cook, who makes bread or other articles to use as food; and many other persons, whose pursuits in life demand the working of some materials into certain forms. * * * We know of no technical meaning to be given to the word 'manufacturer,' used in the statute, and it is our best judgment that it should be understood in its popular sense. We therefore would include among the manufacturers those who produce goods from a raw state by manual skill and labor, and goods which are commonly turned out of factories, and we would exclude a merchant tailor, who merely cuts and fashions a suit of clothes as ordered by a customer, from cloth purchased elsewhere, and kept to be made up as suits are ordered from him."

The decision of the Sixth Circuit Court of Appeals relied on is that of City of Memphis v. St. Louis & S. F. R. Co., 183 Fed. 529, 106 C. C. A. 75. In that case it was held that the compress plant of a cotton company was not a "manufacturing plant" under a statute of Tennessee authorizing a railroad company to build lateral roads not ex-

ceeding 15 miles in length extending from their main stem or any branch "to any mill, quarry, mine, manufacturing plant or to the bank of any navigable stream."

Judge Sanford did not attempt to reason the matter out for himself, but viewed it from the standpoint of the decisions. Amongst the decisions cited and relied on were the two natural ice cases, one from Massachusetts and the other from New York, and the two coffee cases, one from Louisiana and the other from New York, the decision of Judge Blatchford in the hay case heretofore considered, and the first of the decisions of the Supreme Court of the United States to be hereafter considered. He said:

"While various definitions of the terms 'manufacture' and 'manufacturing plant' are given in the adjudged cases, making it difficult to frame an exact definition of the term 'manufacturing plant,' as defined by the unbroken weight of authority, the closest analogy to the precise question now under consideration is to be found in those decisions which hold that the cutting of natural ice on the surface of a pond into pieces of a convenient size for handling, and storing the pieces so cut in a building, is not a 'manufacture' within the meaning of the tax laws, the material being in no way changed, or adapted to any new or different use, but remaining ice, to be used simply as ice (Hittinger v. Westford, 135 Mass. 258, 262); that a corporation organized to collect, store, and preserve natural ice, prepare it for market, and transport and vend it, is not a manufacturing corporation within the meaning of the tax laws, its tools and conveniences being 'for convenience in handling and marketing a product, and not at all for making it.' (People v. Knickerbocker Ice Co., 99 N. Y. 181, 183, 1 N. E. 669, 670); that a corporation engaged in roasting, mixing, and grinding coffee is not a manufacturing company within the meaning of the tax laws (People v. Roberts, 145 N. Y. 375, 40 N. E. 7; City of New Orleans v. Coffee Co., 46 La. Ann. 86, 14 South. 502); that marble which has been cut into blocks simply for convenience in transportation is not a manufactured article within the meaning of the tariff laws (United States v. Wilson, 1 Hunt, Mer. Mag. 167, 28 Fed. Cas. 724); and that hay which has been pressed into bales ready for market is not a manufactured article within the meaning of the tariff laws, although labor has been expended in cutting and drying the grass and bailing the hay (Frazee v. Moffitt [C. C.] 20 Blatchf. 267, 18 Fed. 584)—these last two cases, it is to be noted, being cited with approval in Hartranft v. Wiegmann, 121 U. S. 609, 615, 7 Sup. Ct. 1240, 30 L. Ed. 1012. And so it is held that the mere fact of the application of labor to an article, by hand or machinery, does not make it a manufactured article within the meaning of the tariff laws, unless the application of such labor effects some transformation in the character of the article and converts it into a new and different article, having a distinctive name, character, or use. Hartranft v. Wiegmann, 121 U. S. 609, 615, 7 Sup. Ct. 1240, 30 L. Ed. 1012; Foppes v. Magone (C. C.) 40 Fed. 570, 572; United States v. Semmer (C. C.) 41 Fed. 324, 326; Baumgarten v. Magone (C. C.) 50 Fed. 69, 71."

The two decisions of the Supreme Court cited and relied on by the respondents are the case of Hartranft v. Wiegmann, 121 U. S. 609, 7 Sup. Ct. 1240, 30 L. Ed. 1012, cited and relied on by Judge Sanford, and in several of the decisions from noncontrolling jurisdictions heretofore considered, and the recent case of Anheuser-Busch Brewing Association v. United States, 207 U. S. 556, 28 Sup. Ct. 204, 52 L. Ed. 336.

In the Wiegmann Case the question was whether certain articles were "manufactures of shells," made dutiable by a certain provision of the tariff laws, or "not manufactured" shells, made exempt from duty by another provision thereof. These articles were shells which

had been gathered in London from the seashore in all parts of the world and there subjected to a certain treatment, which altered them to a certain extent. In their natural condition the shells consisted of two or three layers. By the treatment all layers were removed except the inner one, which presented a pearly appearance, and in case of some of them, in addition, the Lord's Prayer or some motto was etched on them. In either condition they were used as ornaments, and in the former condition they were sold for the purpose of making buttons and handles to penknives out of them. It was held that in neither case were the articles "manufactures of shells." They were all "unmanufactured shells" Judge Blatchford, who decided the hay case before his elevation to the Supreme Bench, delivered the opinion of the court. He said:

"We are of the opinion that the shells in question here were not manufactured, and were not manufactures of shells, within the sense of the statute imposing a duty of 35 per centum upon such manufactures, but were shells not manufactured, and fell under that designation in the free list. They were still shells. They had not been manufactured into a new and different article, having a distinctive name, character, or use from that of a shell. The application of labor to an article, either by hand or by mechanism, does not make the article necessarily a 'manufactured article,' within the meaning of that term as used in the tariff laws. Washing and scouring wool does not make the resulting wool a manufacture of wool. Cleaning and ginning cotton does not make the resulting cotton a manufacture of cotton. In Schedule M of section 2504 of the Revised Statutes, page 475, 2d edition, a duty of 30 per cent. ad valorem is imposed on 'coral, cut or manufactured'; and in section 2505, page 484, 'coral, marine, unmanufactured,' is made exempt from duty. These provisions clearly imply that, but for the special provision imposing a duty on cut coral, it would not be regarded as a manufactured article, although labor was employed in cutting it."

He cited four decisions in support of the conclusion reached. The first of these was his hay case. The third was the decision of the Supreme Court in the early case of United States v. Potts, 5 Cranch, 284, 3 L. Ed. 102, in which it was held that round copper plates, turned up and raised at the edges from four to five inches by the application of labor, to fit them for subsequent use in the manufacture of copper vessels, but which were still bought by the pound as copper for use in making copper vessels, were not manufactured copper. In the fourth case, to wit, United States v. Wilson, 1 Hunt, Mer. Mag. 167, Fed. Cas. No. 16,736, Judge Betts, of the lower federal bench, had held that marble which had been cut into blocks for the convenience of transportation was not manufactured marble, but was free from duty, as being unmanufactured.

The second case was the decision of the Supreme Court in the case of Lawrence v. Allen, 7 How. 785, 12 L. Ed. 914, which he states was to the effect that india rubber shoes, made in Brazil by simply allowing the sap of the india rubber tree to harden upon a mold, were a manufactured article, and that:

"Because it was capable of use in that shape as a shoe, and had been put into a new form, capable of use, and designed to be used in such form."

The Anheuser-Busch Brewing Association Case was what may be termed a drawback case. It arose under an act of Congress which

provided that, where imported materials on which duties had been paid were used in the manufacture of articles manufactured or produced in the United States, there should be allowed on the exportation of such articles a drawback, equal in amount to the duties paid on the materials used, less 1 per centum of such duties.

The association was engaged in the manufacture of beer at St. Louis and exporting it in large quantities from the United States in bottles duly corked by it with corks so as to preserve the beer. The corks which it so used had been imported by it from Spain, where they had been cut by hand to a size of over three-fourths of an inch in diameter, measured at the larger end. After being received in St. Louis, a careful selection was made from them of those fit for use, and those selected were assorted according to sizes and branded by unskilled labor. They were then put into a machine or air fan, and all dust, meal, bugs, and worms were removed therefrom. They were then thoroughly cleansed by washing and steaming, removing the tannin and germs, and making the cork safe and elastic, and made absolutely dry by exposure to blasts of air in a machine. Following this, they were put for a few seconds into a bath of glycerine and alcohol, which closed up all the seams, holes, and crevices, and gave the corks a coating. The corks were then dried by the absorption of the chemicals that covered them. This whole process took from one to three days; the longest part of it being the drying after the chemical bath. They were then taken to the bottling department, where they were again soaked or wetted by steaming them for a short time, so they would fit snugly and easily in the bottles. All of this was done by skilled labor. The object of the treatment was twofold—to prevent the beer from acquiring the taste of the cork, and to prevent the escape of the gases in the beer, the escape of which would render it flat. Either result happening would injure the market for the beer, and not otherwise could beer with safety be exported from the United States to foreign countries. The Brewing Association claimed that on the exportation of these corks in the bottles of beer it was entitled to the statutory drawback. The Supreme Court denied its right thereto. Mr. Justice McKenna said:

"In opposition to the judgment of the Court of Claims, counsel have submitted many definitions of 'manufacture,' both as a noun and a verb, which, however applicable to the cases in which they were used, would be, we think, extended too far if made to cover the treatment detailed in finding 3 or to the corks after treatment. The words of the statute are indeed so familiar in use and of meaning that they are confused attempts at definition. Their first sense as used is fabrication or composition. A new article is produced, of which the imported material constitutes an ingredient or part. When we go farther than this in explanation, we are involved in refinements and impracticable niceties. Manufacture implies a change, but every change is not manufacture, and yet every change is an article in the result of treatment, labor, and manipulation. But something more is necessary, as set forth and illustrated in Hartranft v. Wiegmann, 121 U. S. 609 [7 Sup. Ct. 1240, 30 L. Ed. 1012]. There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.' This cannot be said of the corks in question. A cork put through the claimant's process is still a cork."

This completes the presentation of the decisions relied on by the respondents to support their contention. I have given, not only the point decided in each of them, but the reasoning and authorities upon which each was based. It will be noted that certain of the decisions coming from noncontrolling jurisdictions have been cited and relied on in those coming from controlling jurisdictions. The ice cream and coffee cases from Louisiana were cited by the Kentucky Court of Appeals in the laundry case; the natural ice cases from Massachusetts and New York, the coffee and slaughterhouse cases from New York, and Judge Blatchford's hay case were cited by the Sixth Circuit Court of Appeals in the compress case; and the hay case was cited by the Supreme Court in the shell case. This indorsement of these decisions coming from noncontrolling jurisdictions may be thought to give them more weight than they would otherwise have. It will be noted, further, that in no one of these decisions was it held that an establishment of the character of that involved here was not a manufacturing establishment, or that the owner or the operator thereof was not a manufacturer. The argument is that the cases involved in these decisions are analogous to this, and that it follows, therefore, from the fact that the persons as to whom the question was there whether they were manufacturers were not, that the bankrupt was. The reasoning on behalf of respondents is thus largely analogical. And it will be noted, further, that in each one of these decisions the reasoning by which it is upheld, if not entirely so, is almost entirely of the same character.

Respondents gather from these decisions that the mere application of labor to an article by means of machinery, however complicated, does not constitute the one applying it thereto a manufacturer, and from the coffee cases, one of them, the Louisiana case, approved by the Court of Appeals of Kentucky in the laundry case, and the other, the New York case, approved by the Sixth Circuit Court of Appeals in the compress case, that mere change in the color resulting therefrom does not constitute him such. But what they most emphasize is the epigrammatic formula found in the hay, the shell, and the cork cases, varied in each to suit its particular character. In the hay case Judge Blatchford said, they say, that hay is not a manufactured article because it "is still grass," and in the shell case that the articles there involved were not manufactures of shells because "they were still shells," and in the cork case Judge McKenna said that a cork put through the brewing company's process was not a manufactured article because it "is still a cork." As the cherries here, after being treated by the bankrupt, were still cherries, they maintain that, because of this formula, the bankrupt was not a manufacturer, and its establishment was not a manufacturing establishment. They urge that the bankrupt's business was that of fruit preserving. It characterized itself as a fruit preserver on its letter heads, and in its articles of incorporation it is stated that it was formed for the purpose of "buying, selling, dealing, preserving, and packing fruits, vegetables, fruit products, and similar articles." They cite no case involving the question as to whether a fruit preserver is a manufacturer, but refer to two dicta, which they

claim are to that effect. One is the dried apple illustration of Judge Blatchford in the hay case. He said that:

"Dried apples would not be called manufactured article, though the apple is peeled, and cored, and sliced, and dried by exposure to the sun and manipulation."

The other is a statement of Mr. Justice Brown in the case of Schlitz Brewing Co. v. United States, 181 U. S. 584, 589, 21 Sup. Ct. 740, 45 L. Ed. 1013, to the effect, as they put it, that canning fruits and vegetables by a process that requires them "to be incased" does not constitute manufacture. Such, then, I understand to be the line of respondents' argument. I think I have made a full and fair presentation of it. It must be conceded that it is quite formidable, and that he who undertakes to meet it has somewhat of a task before him. It is in order now to test its soundness.

Before coming to close quarters with it, some preliminary observations and queries are not out of place. The first observation I would make is that the subject now in hand is a large one. That subject may be stated to be: Who is a manufacturer, within the meaning of legislation favoring manufacturers in the way of exempting them from taxation or payment of duties, or providing for facilities to do business, or favoring their employés or persons furnishing materials or supplies, in way of giving them a lien or priority? I take it that, within the meaning of legislation of the latter character, he is a manufacturer who is such within the meaning of legislation of the former. Hence I class the two kinds of legislation together. I take it, also, that the words "manufactured article," when used in such legislation, mean an article manufactured by one who is a manufacturer within the meaning thereof, and that the word "manufactory," or the words "manufacturing establishment" or "manufacturing plant," so used, mean a place where articles are manufactured by one who is a manufacturer within such meaning. Hence I limit the subject to a consideration of who is a manufacturer within the meaning of such legislation. I am not concerned with the meaning, in other connections, of the verb "to manufacture," or the noun "manufacture," or the participial adjective "manufacturing."

There is a note to the case of Williams v. Park, 72 N. H. 305, 56 Atl. 463, as reported in 64 L. R. A. 33, dealing with the question as to what are manufacturing corporations within the meaning of taxation laws, which covers 37 pages, many of them full pages, of small print, in double columns, in which several hundred cases are referred to. The subject is not only a large one, but there is considerable conflict in the decisions having to do with particular phases of it, and there is not a little confusion of thought in regard to it. The author of the note referred to says "the decisions contain many anomalies." He instances some of them by asking these questions:

"Why is cutting up trees into blocks of kindling wood for use in furnaces manufacturing, while cutting up ice into blocks for use in refrigerators is not? Why is making biscuits manufacturing, while making bread or ice cream is not? Why is printing and publishing books and magazines manufacturing, while printing and publishing newspapers is not? Why is putting the parts of a fountain pen together manufacturing, while the putting of the parts of

a cask together is not? Why should the dried sap of the caoutchouc tree, if collected around a shoe last, be a manufactured article, while grass dried into hay is not?"

He adds:

"Many similar questions arise in one's mind, and find no answer when the cases are read together."

In view of this situation, the whole subject calls for fresh treatment from the ground up, so as to bring order out of chaos. Such treatment would call for a consideration of each case where the question had been involved and much reflection. Want of time prevents my giving such a treatment to the subject, and I do not feel that the necessities of this case require that I should do so; but the failure to do so, whilst I do not think it will affect the correctness of the conclusion reached, may be responsible for possible crudities which I may be guilty of in the course of the discussion. The ideas which I have are the result of reflection upon the decisions already considered and a few others.

[1] The next observation which I would make is that whether one is a manufacturer is to be determined by what is his principal business, and not by what are mere incidents to it. In the New York slaughterhouse case Judge Martin noted that the fertilizer which was made at such an establishment might be regarded as a manufactured article, but held that this fact did not affect the character of the operator's occupation, because the making of fertilizer was not the "principal business" in which he was engaged, but was a "mere incident" to it. In the case of In re Chandler, Fed. Cas. No. 2,591, Judge Lowell gave two reasons for saying that a farmer, who made cider or cheese, was not a manufacturer. One was that:

"The making is one merely incidental to the cultivation of his land, like curing hay, etc."

No doubt many other cases can be found where a similar position has been taken.

The final observation which I would make is that, in determining who is a manufacturer within such meaning, we should not limit ourselves to the grammatical meaning. This is so because the word, in the course of time, has taken on more than its grammatical, or more specifically its etymological, meaning. Etymologically it means one who makes something by hand. It is now not so limited to one who makes by hand. It at least includes one who makes by machinery. Common usage has given at least this additional significance to it. In the case of Lawrence v. Allen, supra, Mr. Justice Woodbury said:

"Going to more technical definitions and to first principles, such a process to make the shoe is making an article by the hand, which was once the literal meaning of the word 'manufacture,' or 'manu factum,' and in the more modern idea attached to the word it is making an article, either by hand or machinery, into a new form, capable of being used, and designed to be used, in ordinary life."

And in the case of Tidewater Oil Co. v. United States, 171 U. S. 210, 18 Sup. Ct. 837, 43 L. Ed. 139, Mr. Justice Brown said:

"The primary meaning of the word 'manufacture' is something made by hand, as distinguished from a natural growth; but as machinery has largely

supplanted this primitive method, the word is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product."

The queries which I would put are these: In the first place, is one who simply makes by hand ever a "manufacturer" within the meaning of such legislation? Is it not essential that he be a maker by machinery to a more or less extent in order that he come within its meaning? Again, to this end, is it or not essential that he be a maker on a considerable scale? If so, this of itself would seem to exclude a maker by hand, as the one who makes by hand cannot make on a considerable scale. I find an indication that this is essential in two old cases coming from the lower federal bench. In the case of Schriefer v. Wood, Fed. Cas. No. 12,481, Judge Hall, in explaining why it is "that we do not ordinarily call a wood-sawer a manufacturer, and that we do not usually term a miller, who simply grinds corn in his mill, a manufacturer," gives as one reason therefor that "their operations are usually quite limited." He said further:

"We do not ordinarily apply the term 'manufacturer' to one whose operations are as limited as those of a wood-sawer; but, when great quantities of salable articles are produced, even by a single operation of a very simple machine, we frequently, if not ordinarily, speak of the operation as a manufacture. When large quantities of kindling wood are made by splitting blocks of wood by machinery adapted to that special purpose, we do not hesitate to speak of it as a 'manufacture of kindling wood,' and an establishment where very large quantities of bone dust are produced by grinding by machinery would, by many in ordinary conversation, be termed a 'manufactory of bone dust.'"

And in the Chandler Case, supra, Judge Lowell said:

"One who works up lumber on a considerable scale is popularly called a 'manufacturer' of that article, and such lumber is spoken of as 'manufactured' in our tariff acts and treasury regulations, and in the lately repealed [reciprocity] treaty regulating commerce with Canada."

The lumber in that case came from the land of the operator of the sawmill, and it was in answer to the suggestion in argument that it was like the case of a farmer making cider or cheese that he gave two reasons, one of which has already been quoted. The other is in these words:

"These products, when made by the farmer exclusively from his own farm, are not usually made on so large a scale as to be called a 'manufacture,' as the word is now commonly used."

Still again, is it sufficient for the person in question to be a maker of things with the making of which machinery had a part, more or less, to do, and that on a considerable scale? Is it not essential that he be a seller of the things which he makes? Is not the word used in contrast to the word "merchant," "trader," or "dealer"? The latter sells what he buys. Does not the manufacturer sell what he makes at least from what he buys? Ordinarily, at least, he must be a seller; for in the very nature of things he cannot keep making things. It is essential for him to sell the things which he makes to keep going.

In Norris v. Com., 27 Pa. 495, the word "dealer" was thus defined:

"A dealer, in the popular and therefore in the statutory sense of the word, is not one who buys to keep, or makes to sell, but one who buys to sell again.

He stands intermediately between the producer and the consumer, and depends for his profits, not upon the labor he bestows on his commodities, but upon the skill and foresight with which he watches the markets."

This definition is quoted in note to 21 Ann. Cas. 78, and it is then said:

"The term 'dealers,' when used in a statute to describe persons who shall pay a tax, does not include manufacturers who sell only their own manufactures. Every manufacturer must sell his wares; but he is not for that reason to be classed as a dealer in such goods."

Reference is then made to the case of Harms v. Parsons, 32 Beav. 328, in which Sir John Romilly, Master of the Rolls, held that one engaged in the business of a horsehair manufacturer, who sold his business to another and agreed with him not thereafter to carry on the "business of a horsehair manufacturer," breached his agreement by buying and selling manufactured horsehair. And in the case of People ex rel. Tiffany & Co. v. Campbell, 144 N. Y. 166, 38 N. E. 990, Judge Andrews said:

"Without the power of sale, the business of production could not be carried on. The power to sell is an indispensable adjunct to a manufacturing business."

It is in this connection particularly that I would limit the subject in hand to who is a manufacturer within the meaning of such legislation; for the noun "manufacture" may be used in connection where it means no more than making, as, for instance, in the case of Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346, the Iowa statute involved therein provided that "no person shall manufacture or sell," and Mr. Justice Lamar said:

"The conjunction is disjunctive. The sale is forbidden, the manufacture is forbidden, and each is forbidden independently of the other."

And again he said:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The function of commerce is different. The buying and selling and the transportation incidental thereto constitute commerce."

And in the case of United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, Mr. Chief Justice Fuller said:

"Commerce succeeds to manufacture, and is not a part of it."

Here undoubtedly the word "manufacture" is confined solely to making. It is in view of these expressions that I have expressly limited the subject under consideration as above. And the query that I am now putting is whether, invariably, in such connection, a manufacturer is one who is a seller of what he makes?

This suggests the additional query whether he is not also a buyer of that out of which he makes what he sells? Here one runs counter to decisions where this is not recognized as an element of the term. As for instance, in the Chandler Case, already twice referred to, a lawyer, who had quit the practice of the law and gone to operating a steam

sawmill, soon thereafter landed in bankruptcy. The lumber from which he made boards and shingles came from his own land. The question was whether he was a manufacturer. It was held he was. Judge Lowell began his opinion with this question:

"I am disposed to agree with the argument of the defendant's counsel that one cannot be.a trader unless he buys, as well as sells; but is not Mr. Chandler a manufacturer?"

The presupposition of the question seems to be that, for one to be a manufacturer, he must sell, and the answer was that he need not buy as well as sell. He said:

"The fact that the manufacturer uses only lumber which he grows himself does not appear to be material."

In my investigation I have run across other cases where this same position is taken, but I cannot lay my hand on them.

This leads up to two other queries. Though it is not necessary, in order for one to be a manufacturer, that he should buy that out of which he makes, is it or not essential that what he makes be made out of what Mr. Justice Lamar, in the quotation made above from his opinion in the case of Kidd v. Pearson, calls "raw materials," which pass into what is made? In the quotation from the opinion of Judge Bartlett in the New York coffee case, made above, occurs this reference to Webster's definition of the word "manufacture":

"Mr. Webster defines 'manufacture' to be anything made from raw materials by the hand, by machinery, or by art, as clothes, iron utensils, shoes, machinery, saddlery, etc."

And in the case of Schriefer v. Wood, supra, Judge Hall makes this reference to the definitions of the word "manufacture" as given in the dictionaries:

"Among the definitions given by Webster, are: (1) 'The operation of reducing raw materials of any kind into a form suitable for use, by hand, by art, or by machinery;' (2) 'anything made from raw materials by the hand, by art, or by machinery;' (3) 'to make or fabricate from raw materials by the hand, by art, or by machinery, and work into forms convenient for use;' (4) 'to work raw materials into suitable forms for use.' Worcester has the same definitions, in substance; and similar definitions are found in other dictionaries."

In each of these definitions the words "raw materials" figure. It is this question which is involved in the conflict of the courts as to whether an electric plant is a manufacturing establishment or not. The Court of Appeals of New York holds that it is; but the Supreme Courts of Maryland and New Hampshire hold that it is not. In the case of Williams v. Park, supra, Judge Chase said:

" 'Manufacturing,' then, in the present statute, is used in the sense of working materials into a fabric or structure for use, as, for example, cotton into cloth, iron into tools, wood into carriages, etc. This is the ordinary meaning of the word, and, independently of the light thrown upon it by the history of the statute, would be regarded as the meaning which the Legislature attached to it. The question then resolves itself into this: Whether the collection and distribution of electricity, for purposes of power and light, are manufacturing within the sense of the word? Machinery and manual labor are required in the process, but this fact alone does not bring it within the meaning of the word. The product of the machinery and labor must be a fabric or structure made from materials of some kind."

The final query is, if it is essential that what is made be made out of materials or raw materials, must such materials or raw materials be dead? This question is involved in the question as to whether the operator of a slaughterhouse is a manufacturer.

The necessities of this case do not require that I make answer to either of these queries. The bankrupt used machinery in its establishment to produce the articles produced; it produced on a considerable scale; it was a seller of what it produced from dead materials bought by it. It follows from this that neither one of these queries is directly involved herein, and it is for this reason that the necessities of the case do not require that I take position as to either. The only question involved herein, therefore, is whether the bankrupt was a maker. In order for it to have been a manufacturer, it is essential that it was a maker. Whatever meaning, in addition to its etymological meaning, common usage has given to the word "manufacturer," or is attached to it when used in legislation of the kind heretofore referred to, the idea of being a maker has not been eliminated therefrom. The discussion, then, has brought us up to and centered in this question, whether the bankrupt was a maker. If it was, it was a manufacturer. If it was not, it was not a manufacturer. And the question whether it was is a philosophical or logical one.

In disposing of it, the bearing thereon of the decisions relied on by respondents should first be determined, and then the matter should be treated independently of them. By the bearing of those decisions on this question I mean the bearing of the point decided in each one of them; i. e., that the person there in question was not a manufacturer. The bearing thereon of those decisions depends on whether the cases in which they were rendered are truly analogous to that in hand. In so far as they had features not found here, which called for the decision rendered, they are not analogous.

Such of those cases as involved directly any of the queries which I have put are not true analogies, if the query there involved should be answered in the affirmative; for none of those queries are involved here. Such an answer of itself necessitated the decision that the person in question was not a manufacturer. Hence there was no call to pass on the question whether he was a maker, the only question involved here. The New York slaughterhouse case, for instance, involved the query whether, for one to be a manufacturer, he must make from dead materials. If he does, then on this ground alone the New England Dressed Meat & Wool Company was not a manufacturing corporation, and it was properly so held. In this contingency the case did not necessarily involve the question whether that company was a maker.

Again, the Kentucky laundry and the Sixth Circuit Court of Appeals compress cases each involved the query whether, for one to be a manufacturer, he must be a seller of what he makes. In neither case was the person in question a seller. In each he performed a service for another; in one he laundered clothes; in the other he compressed cotton. If, then, for one to be a manufacturer, he must be a seller of what he makes, in neither case was the person in ques-

tion a manufacturer, and it was properly so held. In this contingency neither case necessarily involved the question whether the person in question was a maker. With these cases must be classed certain of the analogies relied on in certain of the other cases. The ginning cotton and threshing wheat analogies mentioned by Judge Blatchford in the hay case, and the scouring wool analogy, mentioned by him in the shell case, are similar in this particular to the laundry and compress cases. In each of these analogies a service is performed by one for another. There is no selling. To the same class may be said to belong analogies where, in connection with the performance of service, title to property passes from the one to the other. Such is the case of a contractor, who undertakes to erect a building for another, furnishing all the materials. No doubt the shipbuilding analogy, referred to in the Louisiana coffee case, belongs here. Such a contractor is not regarded as a seller. If, then, that he be a seller is an essential characteristic of a manufacturer, not one of these instances is a true analogy to the case in hand, where the bankrupt was a seller. Those three cases, to wit, the slaughterhouse, the laundry, and the compress cases, therefore, conditionally, at least, do not have any bearing here; the condition being that the queries which they involved call for an affirmative answer.

The Louisiana ice cream case also has no bearing conditionally; the condition here being that the person there in question was a confectioner, and his production of ice cream was a mere incident to his business of a confectioner, as no one is a manufacturer unless that as to which alone he can be said to be a manufacturer is his principal business, and not an incident thereto, and such was not the case here. I am not in position to say as to what is the truth as to this, as I do not have the full case before me. All I know of it is what I gather from counsel's briefs. But the analogy relied on in the quotation given from the opinion therein, which seems to have influenced the decision, to wit, that of the mammoth kitchen of the Grand Union Hotel at Saratoga, indicates that such was the fact. However, the same illustration was used by the same court in the later coffee case, and the production of coffee there seems to have been, not only the principal, but the only, business of the producer. It is to be noted in connection with this analogy that in the ice cream case its application was made to hang on the circumstance that no one visiting the kitchen would "magnify the cooks and pastrymen into manufacturers"; but the court in the coffee case, in referring to the use which it had made of the analogy in the earlier case, remarked that it had there said "that the mammoth kitchen of a hotel is not a manufactory." That resort should have been made to such an analogy, and such use made of it, indicates the confusion of thought under which the court was laboring. Of course, the mammoth kitchen of the Grand Union Hotel at Saratoga, or of any other great hotel, is not a manufactory, but not because they do not make things in it, but because the kitchen is a mere incident to the business of running a hotel, and the word "manufactory" is never applied to what is a mere incident. For this reason, and the additional one that the term is never applied to the employés in what is properly called a manufactory, the cooks and pastrymen in

such kitchen are never termed manufacturers. This consideration is sufficient to render Judge Blatchford's hay case without bearing absolutely. A sufficient reason for holding that hay is not a manufactured article is that it is produced by a farmer, and the production of hay is simply an incident to the business of farming. It was on this ground that Judge Lowell, in the Chandler Case, put it that a farmer was not a manufacturer from the fact that he cured hay.

The decisions in certain of the other cases are without bearing absolutely, but for a different reason. This is so of the decisions in the two natural ice cases. The ground of their being without bearing is that in connection with the handling of natural ice there is no making, and, of course, where there is no making, there is no maker. The existence of natural ice is due to nature, over whose forces in producing it the handler thereof exercises no control. All that he does is to change the place and manner of its existence after it is produced. He removes it from the pond, river, or lake to the icehouse, and thence to the consumer, and in so doing he divides it up into separate parcels. Altering the conditions of existence of a substance does not constitute making. As well put by Judge Colburn in the Massachusetts case, such treatment of natural ice is no more a making than the putting of water from a pond into casks for transportation, and he properly classed it with mining coal; the only difference being that coal is a permanent formation until dug, and ice is a temporary one.

It has always been held that mining in all its forms is not manufacturing, and no doubt for this reason Judge Betts' decision in the marble case cited by Mr. Justice Blatchford in the shell case belongs here, for quarrying stone is a species of mining. On this ground the compress case and the ginning cotton, threshing wheat, and scouring wool analogies referred to by Judge Blatchford in the hay and shell cases, which, for another reason, I have said are without bearing conditionally, are so absolutely. In such cases there is no making save in what nature has done before the doing of that which alone can constitute the person in question a manufacturer. In what he does he does not make. He simply changes the conditions of existence. The compresser presses the cotton together, the ginner separates the hulls and seeds from the cotton, the thresher separates the wheat from the straw, and the wool scourer cleanses the wool. And on this ground the laundry case, which, for another reason, I have said is without bearing conditionally, is so absolutely. In laundering there is no making in what the launderer does, and hence he is not a maker. The handler of natural ice, the miner, the compresser, the ginner, the thresher, the wool scourer, and the launderer, therefore, are essentially alike in this: That in what each does there is no change in the thing with which he has to do, such change as there is being limited to its condition of existence, and hence no making, and neither is a maker. Neither, therefore, is a true analogy to the bankrupt, because in the matter of coloring, sweetening, cooking, and flavoring a change was made in the thing with which it had to do.

I am not now considering whether such change is sufficient to constitute the bankrupt a maker. That will be considered later. I am merely noting that this difference between those instances and this

renders them without bearing on the question whether the bankrupt was a maker, and that absolutely. I have already noted that the decision in the hay case is without such bearing, because curing hay is a mere incident to the farmer's business. There is an additional reason for this position in the fact that in what the farmer does in curing hay is no making. Judge Blatchford seems to have been of the view that in the change from grass to hay there was no making at all. I will deal with this later. But assuming that he is wrong in this view, and that there is a making in such change, it is nature and not the farmer that makes the change, and hence the farmer cannot be said to be a maker, notwithstanding the adage of making hay while the sun shines. He simply manipulates the grass, so that nature can do her work better. He does not manipulate the forces which are the efficient cause of grass becoming hay. Judge Colburn, in the Massachusetts natural ice case, had the true idea of the matter when he classed hay harvesting and ice harvesting together. There is, however, a difference between the two. In each case, so far as there is a making, it is nature which does the making. The farmer in the one case and the ice man in the other do not make; but the former takes a hand during the process of making, whereas the latter does not do so until that process is completed. In this case the changes in the matter of coloring, sweetening, cooking, and flavoring, as to which it remains to be determined whether it was a making, and constituted the bankrupt a maker, was due to its agency alone.

So far, then, I have reached the conclusion that the natural ice, hay, compress, and laundry decisions are without hearing absolutely, and the slaughterhouse and ice cream decisions are so conditionally. There are reasons for thinking the decisions of the United States Supreme Court in the shell and cork cases are without bearing absolutely; but, as I desire to dispose of all the other decisions relied on before taking them up, I pass them by for the present. As to the slaughterhouse and ice cream decisions, I will assume that they have bearing, because I am not prepared to answer the query involved in the one case in the affirmative, and I am not sure that in the other the production of ice cream was not the principal business of the person as to whom the question was there whether he was a manufacturer. Apart from the decisions in the shell and cork cases, the following will be accepted as having bearing, to wit: The ice cream, the two coffee, the slaughterhouse, and the tailoring decisions. The last one, to wit, the tailoring decision, is the only one coming from a controlling jurisdiction, to wit, the Kentucky Court of Appeals.

Now, a word or two as to the standing of these decisions, in view of the reasoning on which they are severally based. That of the Louisiana ice cream decision is seriously affected by the consideration that it was distinctly based on the mammoth kitchen analogy, which was without bearing absolutely, except on the ground that the making of ice cream was an incident, which does not clearly appear, and that no point was made of this feature. The Louisiana coffee decision was based, not only on this same analogy, but the analogies of mining and shipbuilding, between none of which and the case in hand was there

the slightest resemblance. Its standing is further affected by the attempt to distinguish the case from the rice miller case, between which cases I find it very difficult to see any distinction. It is in this jurisdiction that one of the anomalies referred to by the author of the note to Williams v. Park, supra, is to be found.

In the case of State v. Eckendorf, 46 La. Ann. 131, 14 South. 518, that court held that a baker of bread was not a manufacturer; and in the case of State v. Am. Biscuit Mfg. Co., 47 La. Ann. 160, 16 South. 750, it held that a corporation making biscuits, crackers, and Italian, fancy, and soup pastes out of flour was a manufacturer. I do not have the cases before me. Possibly the baker of bread did not do so on a sufficiently large scale to be called a manufacturer. The decisions in the ice cream and coffee cases can hardly stand against the later decision of that court in the case of State v. Am. Sugar Refining Co., 108 La. 603, 32 South. 965, where it held that refining raw sugar and crude molasses was manufacturing, overruling an earlier decision that it was not in the case of State v. American Sugar Refining Company, 51 La. Ann. 562, 25 South. 447. The decisions of that court show that it has been much befuddled as to what is necessary to make one a manufacturer.

The New York coffee case differed from the Louisiana coffee case, in that in the latter all that was done was to roast green coffees, the effect of which was not to change the form, but the color and internal structure, whereas in the latter, in addition to this, the coffee so roasted was ground and different kinds of coffee were mixed together, forming a combination article. There is little or no reasoning in Judge Bartlett's opinion. It may be said to be wholly magisterial. The only thing in it which can be called reasoning is the statement that for one to be a manufacturer he must produce a new article, which is undoubtedly sound. But it is difficult to make out that the result of the process involved therein was not a new article. Certainly the ground coffee was not the same article as the green coffee bean that was subjected to the process. If it was not the same article, it must have been a new one. Other than this he contented himself with saying, in one place, "We think it very clear," and in another, "It is quite apparent," that the defendant was not a manufacturing corporation, and citing the decision in the shell case from the Supreme Court of the United States, and its previous decision in the natural ice case, heretofore considered, in support of the conclusion reached. When we come to consider the former decision, it will appear how pertinent it was to the case then in hand; and from what we have said as to the latter, it is certain that it was not "in a mile thereof," to use the language of a learned judge.

As to the New York slaughterhouse decision, these things are to be noted. The Appellate Division, from which the case was taken to the Court of Appeals of New York, held that the operator of the slaughterhouse was a manufacturing corporation. As in the coffee decision, the conclusion of the court was not the result of any substantial reasoning. It was nearly a mere fiat. The court began by saying that it thought, and ended by saying that it was clearly of the

opinion, that the operator thereof was not a manufacturing corporation. Confusion of thought is shown in this sentence:

"The business conducted by the relator was obviously that of purchasing, slaughtering, and selling sheep and lambs."

It would have been more correct to say that its business was that of purchasing and slaughtering sheep and lambs, and selling mutton and lamb. The Supreme Court of Ohio, in the case of Engle v. Sohn, 41 Ohio St. 691, 52 Am. Rep. 103, reversing its earlier decision in the case of Jackson v. State, 15 Ohio, 652, held that the business of purchasing and slaughtering hogs, and packing pork, producing lard, and curing hams and bacon, was manufacturing. I see no room on principle for holding that such business is not manufacturing, save the one I have suggested that the word "manufacturer" relates only to one who makes from dead material.

This brings me to the very recent decision of the Kentucky Court of Appeals in the tailoring case. It is somewhat difficult to determine the exact basis of the decision. There are some things about it which are reasonably certain. Judge Carroll was of the opinion that, in determining who is a manufacturer or what is a manufacturing establishment, within the meaning of favoring legislation of the character heretofore described, the dictionary meaning is not controlling—that they have a more limited signification in such legislation. It was such a thought as this which led me to put the several queries hereinbefore set forth. In no dictionary definitions is the idea of making on a considerable scale, or selling what he makes, embraced. The fact that it is favoring legislation tends to the position that it was not intended to embrace every maker. Again, it is certain that the ground of the decision was not that the tailoring company was not a maker; the only possible ground upon which it can have bearing here. It was admitted that what it did came within the dictionary meaning, the fundamental idea in which is that of a maker.

The real basis of the decision seems to have been a fear of the consequence of holding that the tailoring company was a manufacturer and its establishment a manufacturing establishment. It was thought that, if its claim to exemption were sustained, it would be "an unjustifiable discrimination to deny a like exemption to every merchant tailor in the city of Louisville," and that, "if the merchant tailors in the city were granted the exemption, no good reason could be assigned for not exempting all the milliners, all the dressmakers, all the bakers, all the confectioners, all the shoemakers, all the carpenters, and all the cabinet makers who have places of business in the city, and all other persons who are engaged in converting articles from one form to another." It is not unlikely that, if there had been "scorn of consequence," the decision would have been different.

But this consequence would not necessarily follow from a holding that the tailoring company came within the ordinance. There was a difference between it and all these others, which was not noticed. That difference was that it may be said that it made on a considerable scale, and they did not. It is stated that the company had 60 employés and a number of machines operated by electricity, whereas a

merchant tailor would have no more than 12 making by hand and machine. And possibly another difference between it and some of the cases referred to was that the makers were not sellers also.

The final remark which I would make on the case is that Judge Carroll cautioned against the use of the decision as an authority in other cases not exactly like it. He said:

"The meaning that should be given to these words may come up in other cases presenting entirely different states of fact, in which the meaning here ascribed to them would be both inappropriate and unjust, and therefore what we say upon the subject must be understood as referring directly to the question submitted in this record for our decision."

So much, then, as to the standing or weight of these decisions. I frankly concede that if the producer of ice cream, or of unground roasted coffee, or of ground roasted coffee, or of mutton and lamb, or of clothes, is not a maker, then the bankrupt was not, and it was not a manufacturer, or its establishment a manufacturing establishment. But the reasoning on which they are severally based is faulty.

This brings me to a consideration of the two decisions of the Supreme Court of the United States, which, of all of the decisions relied on by the respondents, are probably most in the way of holding against their contention.

The opinion in the shell case was delivered by Mr. Justice Blatchford, who, just before his elevation to the Supreme Bench, had decided the hay case. The epigrammatic formula made use of by him in the shell case, and repeated by Mr. Justice McKenna in the cork case, had its origin in the hay case. In view of this, before taking up the shell and cork cases, the feature of that case, which was passed in our former consideration thereof, should be dealt with. As heretofore noted, it was held therein that baled hay is not a manufactured article. Undoubtedly this decision was sound. Apart from the fact of baling, it was not such on the two grounds heretofore set forth; one being that the curing of hay is a mere incident to a farmer's business, and the other that, though the change from grass to hay is a making, it is nature, and not the farmer, which brings this about. He merely disposes the grass so that nature may do her work better. Its baling does not constitute it a manufactured article, because in baling there is no making; the change which is thereby brought about being simply a change in the condition of the hay's existence, just like, in the compress case, we found that pressing cotton into bales is not making. But Mr. Justice Blatchford did not place the decision on either ground. He placed it on the ground that at no stage in the production of baled hay is there a making. He said:

"Cotton and grains are the same articles they were when on the plant with its roots in the ground. So hay is the same article as it was when it was stalks of grass with roots in the earth. It is dried, to be sure; but the drying, and any conversion of starch into sugar, are mere incidents of the cutting, to enable it to be stored for food in latitudes where grass cannot be found the year round."

What is here said as to hay, I submit, is not sound. Hay is not still grass. Hay is hay, and grass is grass. Hay is different from grass in color, structure, and name. That Judge Blatchford realized

207 F.—10

that he was perhaps putting the matter too strongly appears from his putting it less strongly when, after referring to the dried apple analogy, he said:

"The substance of dried grass or hay is still grass."

What, then, is the bearing of the decisions in the shell and cork cases on the question whether the bankrupt was a maker? And what is to be said as to the validity of the reasoning on which they are severally based, in so far as they have bearing? To determine these matters as to the shell case, it is important to note what was the exact point decided therein. It was that the "Lord's prayers" "Turk's caps," "magpies," and other articles therein involved, were not "manufactures of shells," but were "not manufactured shells." It was not decided therein that they were not manufactured articles, unless the question whether they were was involved in determining whether they were "manufactures of shells," or "not manufactured shells." If I knew just what a "manufacture of shells," within the meaning of the tariff act there involved, was, I would be in a better position to determine whether the decision involved this subordinate question; but I do not know. The opinion contains not the slightest hint of what it is. It simply holds that the articles there involved were not "manufactures of shells," but were "not manufactured shells." If the preposition "of" in the first phrase was used in its privative sense—i. e., in the sense of away from, or as denoting absence or nonexistence, in which case the meaning of the phrase would be manufactures from shells, and would cover articles in which the shells have lost their identity— then the decision that those articles were not manufactured shells did not involve the question whether they were manufactured articles— i. e., articles which had been made, which owed their existence to a maker. Or, if that preposition was used in its causal sense, according to which the meaning of the phrase was artificial shells—i. e., shells that had been made by the act of man, and not by nature—then also the decision that those articles were not manufactures of shells did not involve the question whether they were manufactured articles.

And it is only in the event that the decision did involve this subordinate question that it can have any bearing on the question whether the bankrupt was a maker. But in view of Judge Blatchford's statement, in the course of his argument, that the application of labor to an article "does not necessarily make the article a manufactured article, within the meaning of that term as used in the tariff laws," and his further statement that the provisions thereof as to coral, imposing a duty on "cut or manufactured" coral, implied that, in the absence of a duty on "cut" coral expressly, such coral "would not be regarded as a manufactured article, although labor was employed in cutting it," it may be thought that he regarded the question before him to be whether those articles were manufactured articles. I will assume that he so regarded it, and that such was the question therein. Of course, if that is so, the case does have a direct bearing on the question as to whether the bankrupt was a maker. But, on this assumption, what is to be said as to its correctness and that of the reasoning on which it is based? I am not now concerned with the question as to whether I am

bound to follow it. That will come later. It was not an aid to coming to the conclusion thus assumed to have emphasized, as Judge Blatchford did, the thought that the mere application of labor to an article does not cause it to be a manufactured article. That is a truism, mention of which was more likely to confuse than to enlighten. It did not follow therefrom that the article in question was not a manufactured article. The question in such cases always is whether the result of application of labor to the article in question therein is manufactured articles; i. e., articles of which it can be truly said that they have been made. Such may or may not be the result thereof. And it is upon that question that attention should be concentrated. The substance, if not the whole, of Judge Blatchford's argument, apart from the analogies relied on, is to be found in two sentences, the first of which I have characterized as an epigrammatic formula. They are:

"They were still shells. They had not been manufactured into a new and different article, having a distinctive name, character, or use from that of a shell."

The statement that the articles there involved were still shells should be pressed hard to see just what it can be made to mean. It may mean that they were still parts of the original shells; i. e., that the labor which had been applied to them had not changed them from so being. In this sense the statement may be taken as true. But it may mean that those articles were the same things which they had been before labor was applied to them; i. e., in Judge Blatchford's language, they were not new and different articles. In this sense I respectfully submit that the statement was not true. Those articles were not the same thing which they had been before labor was applied to them. Not being the same, it necessarily followed that they were new and different articles. And they were new and different, in that they had a distinctive name, character, and use from that of shells. They were called "Lord's prayers, "Turk's caps," "magpies," etc., whereas before they were simply called "shells." They were only parts of shells, beautified and ornamented; whereas before they were as nature had made them. They were used as ornaments, and to make pen knives and buttons; whereas before they were put to no use. If, then, the decision is to be taken as holding that those articles were not manufactured articles, so much of the reasoning on which it was based is faulty. So much of it as relied on certain analogies is equally so. Scouring wool and ginning cotton does not result in manufactured articles, because, as we have shown, in the application of such labor to wool and cotton there is no change in them, and hence no making. Wool and cotton thereafter are the same articles which they were before. The sole effect of the application of such labor thereto is to change the conditions of their existence. They are merely separated from the substance in connection with which they have previously existed. I am not sufficiently posted as to what cut coral is to attempt a criticism of this analogy. The baled hay analogy, from what I have already said, was not pertinent, nor was the marble blocks analogy. In the latter there is no change in the marble, and hence no making, in connection with cutting the marble into blocks. That is a species of

mining. In the former, though there is a change from grass to hay, and hence a making in connection with curing the hay, the farmer is not the efficient cause of the change or making, and, in so far he renders aid, that is an incident to his business as a farmer. I am not quite sure that I understand the copper plate analogy. It was held in the case involving it that round copper plates, turned up and raised at the edges, were not manufactured copper. If by manufactured copper was meant articles manufactured out of copper, I cannot see its pertinency. The only other analogy, to wit, that of the india rubber shoes, favored the holding that the articles in question therein were manufactured articles. By the efficient activity of the person, as to whom the question was whether he was a manufacturer, the sap of the india rubber tree had been changed into india rubber shoes. So, in the shell case, by the efficient activity of that person the natural shells had been changed into those articles. The change was not so great, yet it was a distinct change. For these reasons, therefore, I am driven to the conclusion that, on the assumption that what was decided therein was that the articles in question were not manufactured articles, the decision cannot stand criticism. The case has been pretty frequently interpreted as so deciding; i. e., that in the production of those articles there was no making, and the producer thereof was not a maker, and it has been much cited. It was cited in the two coffee cases herein criticised, where it was evidently so interpreted; and I am much persuaded that it is responsible for much confusion of thought in the field now under consideration.

This leaves the cork decision. In connection with this case it will be noted that the question for decision therein was, not whether a person whose sole business was to produce by the process therein described corks which would prevent the escape of gas from the beer inclosed by them in bottles, and would not impart their taste to it, from corks imported by him from Spain, or not so imported, and then place them on the market, would be a manufacturer, within the meaning of legislation of the character hereinbefore referred to. No such question was presented. To understand this decision, clearly, note should first be taken of the earlier decision of that court in the case of Joseph Schlitz Co. v. United States, 181 U. S. 584, 21 Sup. Ct. 740, 45 L. Ed. 1013. There the Brewing Company had imported hops, barley, bottles, and corks. It had been allowed the drawback on the hops and barley as coming within the statute. They were imported materials which had been used in the manufacture of beer manufactured by the company and subsequently exported. They, therefore, clearly came within the terms of the statute. They were ingredients of the exported beer. Its right to a drawback on the bottles and corks alone was involved in the case, and it was denied, because the bottles and corks were not ingredients of the exported beer, but only its incasement. The statute was construed to cover only imported materials which were ingredients of the manufactured article subsequently exported. Mr. Justice Brown said:

"To speak of the bottles and corks as ingredients of the beer is simply an abuse of language."

In this case it did not appear that the corks had been given any special treatment to fit them for duty. The later case came about by another Brewing Company thinking that because of such treatment it could get within the drawback statute as to its corks. Its position was that the imported corks were an ingredient of the exported corks, and on the exportation of the bottled beer it would be entitled to the drawback. Mr. Justice McKenna was of the opinion that there was force in the position that within the meaning of the statute the corks and bottles were not exported; an exportation of the article of which the imported materials were an ingredient being essential to entitle one to the drawback. Within that meaning the beer alone was exported; the exportation of the corks and bottles being a mere incident to its exportation. But he did not place the decision on that ground. In the earlier case Mr. Justice Brown, as we have seen, construed the words "imported materials  *  *  *  used in the manufacture of articles manufactured or produced in the United States," in the statute, as covering only such materials as became ingredients of another article manufactured or produced in this country. It was far-fetched to say that the imported cork was an ingredient of the finished cork. And the denial of the right to the drawback might well have been placed on this ground. I will not say that it was not so placed. But the matter was put in such a way as to lend color to the view that, if the question in the case had been that which I have stated it was not, it would have been decided that such person was not a maker, and hence not a manufacturer, within the meaning of such legislation. What Mr. Justice McKenna says that lends color to this view is open to some criticism. He says, for instance:

"Manufacture implies a change; but every change is not a manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary."

Now, I take it that "manufacture" here means the same as making. And it will clear the situation somewhat to substitute the one word for the other. So doing we have:

"Making implies a change; but every change is not a making, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary."

[2] This statement is ambiguous, and in one view of it is, as I submit, erroneous. What sort of a change is had in view? Is it a change in the article itself, which is the subject of treatment, labor, and manipulation, or in the conditions of its existence? The first clause of the first sentence does not say which. It takes in either change. The last clause seems to have in view a change in such article itself. A change in the condition of existence of an article is never a making, but a change in the article itself is always a making. There is no reason why one change in an article itself rather than another shall constitute a making.

He bases this statement on the shell case, which undoubtedly was the source of all that he had to say in this connection. I have already indicated what seems to me the faulty reasoning in that case. He then says:

"There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.' This cannot be said of the corks in question. A cork put through the claimant's process is still a cork."

Undoubtedly there must be transformation, and a new and different article must emerge. But what is essential in order that there may be a transformation, and that a new and different article may emerge? Is it not sufficient that what emerges is not the same article which was in existence before the treatment, labor, and manipulation? If it is not the same, is it not a new and different article, and has not a transformation taken place? And is it material in what the lack of sameness or the newness or difference consists? Is not one particular of such lack, or of newness, or of difference, just as effective as any other? Is there any logical ground for making a difference between such particulars? If not, why then add that the new or different article shall have a distinctive name, character, or use? If the article which emerges is not the same, but a new and different one, what boots it whether it is given a distinctive name or not, or whether it is put to a distinctive use or not? Though it retains its old name, and is put to the same use, has there not been a making? It is essential, however, that it have a distinctive character; but is not saying so tautological? If in fact a new and different article has emerged, is it not necessarily distinctive in character? It seems to me that to constitute a making it is essential that the article which emerges should not be the same, but a new and different article. If it is not the same, it is new and different, and it has a distinctive character, and in that contingency it is entirely immaterial whether it is given a distinctive name or put to a distinctive use.

Coming to the statement that a cork put through the claimant's process is still a cork, we must do as we did with Mr. Justice Blatchford's statement in the shell case that the articles there involved were still shells; i. e., press it hard, and see what possible meanings it is capable of, and which, if any, of them were true. It may mean that the article is still called a cork, or is still used as a cork. This no doubt was the case. But does the fact that it was given the same name and put to the same use as before indicate that there had been no making? The preceding statement in the alternative, that the new and different article which emerges must have a distinctive name, character, or use, conceded that it was not essential that it have a new name or that it be put to a new use. It was sufficient that it had a distinctive character. In the case of Tidewater Oil Co. v. United States, 171 U. S. 216, 18 Sup. Ct. 839, 43 L. Ed. 139, Mr. Justice Brown said that "ordinarily" a manufactured article—

"takes a different form, or at least subserves a different purpose, from the original materials, and usually it is given a different name."

This implies that it need not be given a different name, or subserve a different purpose, and not only this, but that it need not take a different form. Or the statement may mean that the material of the two articles is substantially the same. This, too, was true. But, notwithstanding this, the article produced by claimant's process may not have been the same article which existed before. It may have been a new

and different article. It may have had a distinctive character from the original. And, according to Mr. Justice Blatchford's alternative statement, if such was the case, there had been a transformation and a making or manufacture. Or it may mean that, after the original cork had been put through the process, what resulted was the same thing that existed before, that it was not new or different from what it was before, and that it had no distinctive character. If that was the meaning intended to be conveyed by the statement, I submit that it was not true. What resulted was a clean, tasteless, air-tight, and usable cork. The original cork had neither of these characteristics. That the statement is not true follows necessarily from the consideration that the original cork would not serve the purpose for which the resultant cork was used, and the resultant cork did.

According, then, to all possible meanings, except the last one, the epigram, though true, was of no significance; and according to the last one it was not true.

This is all I have to say as to the bearing of the decisions relied on by respondents on the question whether the bankrupt was a maker, and as to their soundness and that of the reasoning on which they are based.

[3] Was, then, the bankrupt a maker? The answer to this question depends on what is essential to constitute one a maker. My idea as to this is, perhaps, apparent from what has already been said. In order that one may be a maker, it is essential that he be the efficient cause of the coming into existence of something that did not before exist. Making involves causality—the production of an effect by a cause; the effect being the existence of a concrete thing. And the causing a concrete thing to exist involves the idea that it is without previous existence. But it does not involve the idea that no part of such concrete thing existed before. This is so because, so far, at least, as man is concerned, there is no such thing as a making out of nothing. The finite mind can hardly, if at all, conceive of the making of something of which no part existed before. It can only involve the idea that some part thereof was without previous existence. And it would seem to be immaterial as to what part thereof this is true. If some part thereof was without previous existence, it is not the same thing as that which previously existed. It is a new and different thing. It is distinctive in character from that which so existed. If this be thought to be too rigid and thorough-going, it is true, at least, that, if the part thereof which was without previous existence is such as to enable such thing to meet a demand which that which previously existed did not, it is not the same thing, but is a new and different thing, is distinctive therefrom in character, and he who is the efficient cause of its existence is the maker thereof. Ordinarily such thing may have a distinctive use from that which previously existed, but not essentially so. That which previously existed may not serve the use so effectually, or for some other reason may not meet the demand that there is for that particular thing. Ordinarily it may also have a distinctive name from that which previously existed, but not essentially so. By treatment the cucumber becomes a pickle. Though the

pickle has the same outward form as the cucumber, it is distinctive in character from the former in internal structure, color, and taste. It has a different name. By treatment, also, the seed of the mustard plant becomes a condiment. Here the change is more radical. It is in matter of outward form, as well as internally and in color and taste; but the old name is preserved. The condiment is still called mustard. Is it to be said that there is no making in this instance, because the new is still called mustard, but there is a making in the other, because the new is not still called a cucumber, but a pickle? The fact is that in each instance there is a making. The new has parts which were without previous existence, and because it has them it meets a demand which the old does not; and it is immaterial that in the one instance the old name is preserved and in the other a new one is given.

How, then, is it in the case in hand? I will not compare the article purchased by the bankrupt with the article produced by it. Probably it cannot be said that there was any making in the restoration of the cherries which it purchased to their original condition before immersion in brine and sulphuric acid to preserve them. I will compare the cherries in their natural condition with the articles produced by the bankrupt. Is it the same thing as the natural cherry? Or is it a new and different thing, a thing distinctive in character therefrom? There can be no question that the first of these two questions must be answered in the negative, and the other in the affirmative. The coloring, sweetening, cooking, and flavoring—leaving out of consideration the stemming and pitting—to which the natural cherries were subjected by the bankrupt rendered the article produced by it a new and different thing, a thing distinct in character therefrom. It had parts which the natural cherry did not have. It served a purpose which the natural cherries did not serve. In their natural condition the only purpose which they could serve was as an eatable either from the hand or in that best of pies, the ability to make which "in the twinkle of an eye" was the chief accomplishment of Charming Billie's wife. In their artificial condition, as they left the bankrupt's establishment, their chief function was as a garnish, being mainly used, according to counsel for the petitioning creditors, to render the American cocktail "pleasant," or better, "a delight to the eyes," though not "to be desired to make one wise." The article produced by the bankrupt by, reason of the existence of such parts met a demand which the natural cherries did not and could not meet. And as the bankrupt was the efficient cause of the existence of such parts, it was the maker thereof.

On principle I do not see how it is possible to reach any other conclusion. But am I free to dispose of this question in accordance with my view of the matter? Am I not more or less hampered by the decisions relied on by respondents, which I have conceded have a bearing on it, absolutely or conditionally? They are the decisions in the ice cream, the two coffee, the slaughterhouse, the tailoring, the shell, and the cork cases. The last three come from the courts whose decisions are controlling on me, to wit, the Kentucky Court of Appeals and the Supreme Court of the United States, and the ice cream and

the two coffee cases have been given standing by citation by such courts, to wit, by the Kentucky Court of Appeals and by the Sixth Circuit Court of Appeals of the United States. It is possible that the decisions in the two coffee cases and the tailoring case are the only decisions which have bearing absolutely on the question whether the bankrupt was a maker, as in all the other cases it is possible that the decision therein can be placed on another ground than that the producers of the articles there involved were not makers. I will assume, however, that one and all have bearing absolutely, still I do not think that I am affected by them. If they go to the extent of requiring that the bankrupt be held not to be a maker, then they go to the extent of requiring that it be held that there is no such thing as a maker in any case. In so far as they hold that the producers there involved were not makers, they are not sound. They cannot stand the test of just criticism, and, as Judge Carroll said expressly in the tailoring case, they should not be accepted as authorities in any other case.

To a degree, at least, this case involves a larger question than whether the bankrupt was a maker, and hence a manufacturer, and its establishment a manufacturing establishment. That question is whether preservers and canners, who prepare fruits and vegetables for future use, are makers, and hence manufacturers, within the meaning of legislation of the character hereinbefore described, if they have such other characteristics in addition to being makers as may be deemed essential in order that they be such. Indeed, I am not disposed to antagonize the position, which has been assumed in argument, that the question whether the bankrupt was such hangs on the question whether they are such. For I am clear that preservers and canners are makers. By their treatment of the natural fruits and vegetables they give them qualities or parts which enable them to meet a demand which the natural fruits and vegetables do not and cannot meet. They are the efficient cause of the coming about of the existence of articles which would otherwise not exist. The industry of preserving and canning has come to be one of the great industries of modern times. As I write, the day's newspaper contains the following article about it, to wit:

### "AN AMAZING INDUSTRY.

#### "(Leslies' Weekly)

"An idea of the amazing growth of this vital and all-important industry may be had when it is told that there are now nearly 4,000 concerns in the country engaged in canning and preserving, with an invested capital of $119,-207,000. During the last year they paid over $100,000,000 for raw material, and their finished product was $157,101,000. A case of canned vegetables was turned out for every three men, women, and children in that time. Not to mention the fruit and fish, four pounds of condensed milk were put up in 1912 for each inhabitant of the United States. One packing house in Chicago daily cooked canned food sufficient to feed a city of 100,000 population. Think of it.

"We now consume 3,000,000,000 cans of food each year, the surplus crop of the country, which, before the art of preserving was perfected, went to waste. It is so stupendous a quantity that, if the canning industry were suddenly destroyed, a famine might be created. Certainly it would have an effect on

the cost of living, for while that has gone up the price on staple articles in canned food has remained stationary."

If this industry is not to be classed as manufacturing, and those who carry it on as manufacturers, how are it and they to be classed? An indication of how common usage classes them is to be found in the following article taken from the same issue of the same newspaper, to wit:

### "NEW CATSUP FACTORY.

"Special Dispatch to the Enquirer.

"Petersburg, Ind., April 19.—Yesterday evening the Snyder Preserve Company, of Cincinnati, closed the contract with the Business Men's Association at Mt. Carmel for the erection of a factory there. The company agrees to manufacture catsup, employ 200 men and women for 10 months a year, and expend $40,000 on the site before any payment be made to them, and to expend $35,000 to $40,000 for tomatoes and labor each year."

The question as to how they are to be classed seems never to have been involved in any reported case. At any rate the research of counsel has not been able to find a case involving it. As heretofore stated, respondents rely on two dictums in support of their position that such persons are not manufacturers. One is the dried apple analogy referred to by Judge Blatchford in the hay case. It is questionable whether the person who peels, cores, slices, and exposes to the sun the apples can be said to be the maker of the resulting dried apples. Is not nature the real maker, and is not all that he does simply an aid to nature, just as in the case of haymaking, though he renders more assistance than the farmer does in making hay? In the production of india rubber shoes, held to be manufacturing in the case of Lawrence v. Allen, supra, the producer thereof dips the mold in the juice or sap of the caoutchouc tree, resembling milk, and then holds it in the heat and smoke of a fire made by him. This process he repeats several times to produce the shoe. Here the maker makes and manipulates the fire and causes it to dry the juice or sap. In drying apples and making hay there is no manipulation of the sun or of its heat by any one. But, however this may be, the production of dried apples is no one's principal business, so far as I am advised. It is generally a mere incident to housekeeping. It is only as to one whose principal business is that of producing dried apples that the question whether he is a manufacturer can arise.

The other dictum relied on is that of Mr. Justice Brown in the Joseph Schlitz Brewing Company Case. But counsel misinterpret Judge Brown's statement on which they rely. He does not say that canning fruits and vegetables is not manufacturing. He is combating the idea that a beer bottle is an ingredient of the beer which it incases, which, as we have seen, was essential in order to entitle the company to a drawback on account of the bottles. He says that the fact that the beer is steamed after being bottled "certainly does not convert a bottle from an incasement into an ingredient." He then likens it to the cases of bottling champagne and other sparkling wines and Apollinaris and other effervescing waters and of canning fruits and vegetables. The bottling and canning is in all such cases essential to the

preservation of the article bottled or canned. And his argument is that, as the incasement in all such cases is not an ingredient of that which is incased, so the bottles which incase beer are not ingredients of the beer which they incase. He was not thinking of the question whether the one who produces canned fruits and vegetables is a manufacturer, and hence said nothing on the subject. The inference from what he says in this connection is rather that he regarded that he was a manufacturer. His full statement is in these words:

"Thus, champagne and other sparkling wines must be bottled while yet effervescing, or they will lose the 'tang' which gives them their principal value. The same remark may be made of Apollinaris and other effervescing waters, though not manufactured, and of certain canned fruits and vegetables, which are required to be incased while hot and still in the process of preservation."

In distinguishing Apollinaris and other effervescing waters from champagne and other sparkling wines, and possibly beer, also, he uses the qualifying clause "though not manufactured," thus implying that they are not manufactured. But he does not so distinguish canned fruits and vegetables.

There is, therefore, no dictum against the position that preservers and canners are makers, and hence, all other essential characteristics existing, manufacturers. On the other hand, there are two dicta in favor of it. In the case of Engle v. Sohn & Co., 41 Ohio St. 694, 52 Am. Rep. 103, the Ohio slaughterhouse case, Judge Dickman said:

"The occupation of the defendants in error was, we think, essentially that of manufacturers. By the use of tools, implements, and mechanical devices, by subjecting the slaughtered animals to divers processes, running, some of them, through several months, by combination with various materials and ingredients requiring skill, care, and attention, products were obtained in the form of pork, lard, and cured meats, to which may appropriately be applied the term 'manufactured articles.' The original substance, though not destroyed, was so transformed through art and labor that, without previous knowledge, it could not have been recognized in the new shape it assumed, or in the new uses to which it was applied. One who produces such results may as correctly be designated a manufacturer as he who buys lumber, and planes, tongues, grooves, or otherwise dresses the same, or as he who by a simple process makes sheets of batting from cotton, or as he who buys fruit and preserves the same by canning, all of whom have been held to be manufacturers, and taxed as such, under the internal revenue laws of the United States. 9 Int. Rev. Rec. 193; 5 Int. Rev. Rec. 180; Internal Revenue Decisions, 117, No. 171. And as to the article of ice, to which reference has been made in argument, he is not inappropriately termed a manufacturer who produces artificial ice by the method of vaporization and expansion. The dressed lumber, cotton batting, canned fruits, and artificial ice, though but slightly changed from the original material, could not, we think, be properly classified as unmanufactured goods. Indeed, the term 'manufacturer' has been extended to include every object upon which art or skill can be exercised, so as to afford products fabricated by the hand of man, or by the labor which he directs. Curtis on Pat. § 74."

And in the case of State v. American Sugar Refining Company, 108 La. 603, 32 South. 965, the Louisiana sugar refining case, Judge Provosty said:

"Canning factories, which prepare fruits and vegetables for future use without changing the identity of the raw material, are manufacturers, by the very term used to designate them."

Besides these two dicta, which are precisely in point, the decision in the case of In re Alaska American Fish Company (D. C.) 162 Fed. 498, is not without decided bearing on the matter. There involuntary bankruptcy proceedings had been brought against a Washington corporation. An objection to its adjudication was made on the ground that it was not principally engaged in manufacturing, within the meaning of the Bankruptcy Act of 1898.[1] The business of the corporation consisted of catching and preserving by salt and marketing salt water fish. Judge Hanford overruled the objection and said:

"Fish, as a commodity of merchandise, requires the application of a process for its preservation, as well as labor in packing the same in suitable receptacles for handling and transportation. Therefore I hold that the business of said corporation was a manufacturing business, within the meaning of the bankruptcy law, and that it is subject to be adjudicated a bankrupt."

The case is criticised because only half a dozen lines are devoted to the question, no authorities are cited, and no reasoning advanced for the conclusion, and because the right to adjudicate the corporation a bankrupt might have been based on the ground that it was engaged in a trading and mercantile pursuit. It is urged, also, that inquiry has elicited that the industry involved is a vast and extensive one, and the fish are caught, skinned, boned, and cut into pieces, so that, when ready for market, the canned salmon is as different from the fish in its natural state as sliced bacon or other forms of dressed meat are from the animals from which they are taken. This all may be true; but, as I have already indicated, there is nothing in this difference from what is done in preserving and canning fruits and vegetables, or was done by the bankrupt at its establishment, to bring about a difference in decision. And the support of the case is not needed to sustain the conclusion here reached.

I cannot leave this branch of the case without indicating how it seems to me that a case involving the question whether the producer of a given article is a manufacturer, within the meaning of favoring legislation of the character heretofore indicated, should be dealt with. It should be accepted at the outset that in order for him to be such it is absolutely essential that he be a maker, or, in other words, that, whatever other ideas the word "manufacturer" may, in such legislation embody, it at least embodies this idea. This idea should be disentangled from any other possible ideas which the word may embody, and the mind concentrated on whether the producer of the article there involved is a maker. This is readily done by treating the question as being, not whether he is a manufacturer, but whether he is a maker. If it be determined that he is not a maker, that is an end of the case. Not being a maker, he cannot be a manufacturer. If it be determined that he is a maker, then it should be considered what other ideas are embodied in the word—i. e., have, as it were, been imposed on it; and, if it be determined that other ideas are embodied in it, the conformity of the producer in question to each should be considered separately. Though the necessities of this case do not require that I determine whether other ideas than that he is a maker by hand or by machinery are embodied in the word, I feel quite sure that it is not so limited. By this method things are looked at singly, and this is a

[1] Act July 1, 1898, c. 541, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3418).

great aid to seeing them as they are.  I always had a more vivid conception of what I had seen at the old one-ring circus than what it is possible for one to have of what he sees at the modern two-ring circus with a platform performance between.  Indeed, single-mindedness is essential to seeing things as they are.  But to avoid misconception I would note that single-mindedness is not the same as a "single-track mind."  Matthew Arnold, who represented truth as a "mysterious goddess," wrapped in a black robe, and said that we shall never see her, except in outline, seems to have had such a mind in view when he said, further, that the only way to gain a vision of truth "thus even in outline" is "to try and approach" her "on one side after another, not to strive or cry, nor persist in pressing on any one side with violence and self-will," and that "he who will do nothing but fight impetuously towards her on his own one, favorite, particular line is inevitably destined to run his head into the folds of her robe."  This suggestion which I have made as to dealing with such a case may be an Ariadne's thread or a mare's nest.  As to which it may be is for others to judge.

I must also add that one, in dealing with such a case, should be sure of his analogies and his epigrams.  If he does not look out, they will lead him astray.

[4] This brings me to the other position taken on behalf of respondents, and which seems to be mainly relied on.  It is that the statute in question has to do, not with all manufacturing establishments, but only with such as are like the two specified, to wit, rolling mill and foundry, and the bankrupt's establishment, assuming it to have been a manufacturing establishment at all, was not such a one.  They would apply here what is called the rule of ejusdem generis, or, in recognition of its origin, Lord Tenterden's rule.  It is sometimes termed a doctrine.  It is thus stated by Lord Tenterden himself in the case of Sandiman v. Breach, 7 B. & C. 96:

"Where general words follow particular ones, the rule is to construe them as applicable to persons ejusdem generis."

Mr. Justice Brewer, in the case of United States v. Mescall, 215 U. S. 31, 30 Sup. Ct. 20, 54 L. Ed. 77, puts it thus

"Where particular words of description are followed by general terms, the latter will be regarded as referring to things of a like class with those particularly described—ejusdem generis."

Here the particular words "any rolling mill, foundry," are followed by the general term, "or other manufacturing establishment."  The case, therefore, respondents contend, is one calling for the application of this rule or doctrine.  The general term should be construed as if it were "or other such like manufacturing establishment," in which case there could be no question that it did not include all manufacturing establishments, but only such as are like a rolling mill and foundry.

One called on to apply this rule or doctrine should, before attempting to do so, understand exactly the reasoning on which it is based and the essentials to its application.  The case of Newport News, etc., Co. v. United States, 61 Fed. 488, 9 C. C. A. 579, where the rule or doc-

trine was undoubtedly correctly applied, affords a good illustration to bring out these matters. It involved the federal statute forbidding carriers of animals to confine them more than the 28 consecutive hours without unloading for rest, water, and feeding, unless prevented by "storm or other accidental causes." It was held that failure to unload is excused only by accidental causes, which, like storms, are unavoidable, and not by an accident to a train. Judge Lurton said:

"The meaning of the general words, 'other accidental causes,' must be ascertained by referring to the preceding special words. * * * A storm is unavoidable, in the sense that it cannot be prevented. 'Other accidental causes' must be taken to mean 'other unavoidable accidental causes.'"

Literally, the words "by storm or other accidental causes" mean exactly the same thing as if the words used had been "by accidental causes." In other words, each clause literally includes all accidental causes, one no more than the other. The only difference is that the latter expression is the simpler one of the two. To hold that the former includes only a storm or other unavoidable accidental cause is to give it a meaning other than its literal meaning. To give it such meaning literally, and to express it more accurately, it should be made to read "by storm or other unavoidable accidental cause," or more simply "by unavoidable accidental causes." The requirement of the rule or doctrine, therefore, is that the words used should be given a meaning other than their literal meaning, a meaning which they do not express as accurately as they could have been made to express. The idea behind the rule or doctrine, and which brought about its formulation, is that, if the Legislature had intended to include all accidental causes, it would have used the general words, and made no specification at all. In the case of Rex v. Inhabitants of Whitmarsh, 7 B. & C. 596, decided in the same year (1827), when Lord Tenterden stated his rule, where it was held that a statute providing that "no tradesman, artificer, workman or other person whatsoever shall do or exercise any worldly labor, business or work of their ordinary calling upon the Lord's day or any part thereof (work of necessity and charity only excepted)," did not apply to a contract of hiring made with a farm hand upon Sunday, Bayley, J., said:

"If the Legislature had intended to embrace every description of persons and every species of business, it would not have been necessary to make an enumeration of several classes of persons exercising particular descriptions of labor or business. It would have been sufficient to say that no person whatever should do any work or business on the Lord's day. If the enactment had been intended to be general, the Legislature would have used general words."

Littledale said:

"If it [Parliament] had intended that no person should do any work on a Sunday, it would have used different language."

In applying the rule, therefore, the interpreter, in his critical mood, judges the Legislature by himself. He says to himself that if he had been writing the statute in question—e. g., the statute involved in the case taken as an illustration—and had intended to include all accidental causes, he would have said "by accidental causes," and would not have

said "by storm and other accidental causes." That was the simplest, and therefore the logical, way to express the thought, and it should be assumed that the Legislature would in that contingency have acted logically.

We have here an instance of what has been characterized, in connection with the subject of historical criticism, as a "methodological assumption." And it has been questioned whether historical critics are not "too prone to rest content with the assumption that the logical thing is right." It is thus a weakness of the rule or doctrine in question that it overlooks the fact that a Legislature may not always express its meaning as it should logically do. And it has this still further weakness that though, if it had been the intention to include all accidental causes, the logical thing would have been to use the words "by accidental causes" as the simpler expression, and that, therefore, it was illogical not to use them, on the basis that the intention was to include only unavoidable accidental causes, the more accurate, and therefore the more logical, thing to do was to use the words "by unavoidable accidental causes," or "by storm and other unavoidable accidental causes," and not to use the words "by storm and other accidental causes." Wherever, then, the rule or doctrine is applied, a meaning is given to the words used by the Legislature which they do not logically express, and that, because had it intended to express the other meaning, it would have expressed itself logically.

So much, then, as to the reasoning on which the rule or doctrine is based and in criticism of it. As to what is essential to its application, apparently all that is required is that "general words follow particular ones," or that "particular words are followed by general terms." But something more is essential than this. The persons or objects covered by the particular words must belong to a subordinate class of persons or objects within the class covered by the general words, and they must not exhaust all the persons or objects belonging to such subordinate class. Two things, then, are essential: There must be a class within a class, and the former must not be full. That which the rule or doctrine does is, not to eliminate the general words from the statute, but to restrict their meaning. And this it cannot do unless there is both a subordinate class within the class covered by them and such class is not full. A case where this position is enforced is that of United States v. Mescall, supra. The statute there involved provided that:

"If any owner, importer, consignee, agent or other person shall make or attempt to make any entry of imported merchandise" by certain means specified "such merchandise shall be forfeited, * * * and such person upon conviction fined," etc.

The question was whether an employé in the customs service, who had made an entry of imported merchandise in the manner prohibited, could be fined under the statute. It was held that he could, even though he had no goods that could be forfeited. Mr. Justice Brewer stated the position taken against the right to punish him in these words:

"The particular words of description, it is urged, are 'owner, importer, consignee, agent.' The general term is 'other person,' and should be read as re-

ferring to some one similar to those named, whereas the defendant was not owner, importer, consignee, or agent, or of like class with either."

And the basis of the decision was that there was no one of like class with either to whom the general term could apply, and unless it was given its literal meaning it would be meaningless. He quoted with approval this language from a certain Missouri decision:

"Where the particular words exhaust the class, the general words must be construed as embracing something outside of that class. If the particular words exhaust the generis, there is nothing ejusdem generis left, and in such case we must give the general words a meaning outside of the class indicated by the particular words, or we must say that they are meaningless, and thereby sacrifice the general to preserve the particular words. In that case the rule would defeat its own purpose."

The case of United States v. Celluloid, 82 Fed. 627, 27 C. C. A. 231, relied on by respondents, can hardly stand against this decision.

It seems to me that it is essential, also, that it should be obvious that there is a subordinate class to which the persons or objects covered by the particular words belong, and which is not exhausted thereby, and, at least, that it should not have been unreasonable for the Legislature to restrict the legislation to such subordinate class. I do not know what the cases yield on the subject, but I have an idea that the rule should never be applied unless the restriction is one which it appears it is reasonable to make.

The respondents contend that this case meets all requirements. The subordinate class which it is claimed the Legislature had in mind were iron manufactories, to which rolling mills and foundries belong, and which is not exhausted thereby. I have not been advised on the subject of the various iron manufactories, and have no special knowledge thereon myself. I have an idea that rolling mills and foundries have to do with a manufactured product, to wit, pig iron, which is manufactured from the ore in furnaces or smelters, and that there are other iron manufactories having also to do with this manufactured product, or with the manufactured product of the rolling mills and foundries. But is it reasonable to hold that the Legislature could have intended to limit the statute to iron manufactories? What possible reason was there for making such limitation? It must, however, be accepted as rather singular that the Legislature, if it had in mind all manufactories, singled out only two kinds of iron manufactories for specification. The statute was originally enacted March 20, 1876. As originally enacted it covered only "any railroad company, or an owner or operator of any rolling mill, foundry or other manufacturing establishment." In 1893 it was made to cover also any turnpike, canal, or other public improvement company, and in 1894 any mine company. On the same date of its original enactment the Legislature provided for the compilation and publication of "a general account of the agricultural, commercial and mineral resources of the commonwealth of Kentucky" by the Kentucky State Bureau of Agriculture for distribution to emigrants and emigrant societies.

Counsel for respondents make certain quotations from this document. I do not have it before me, nor does the date of its publication appear. Probably it was published in 1876, before or at the time

of the Centennial Exposition at Philadelphia. It appears from those quotations that it was then thought that there were "inexhaustible beds of iron ores in various parts of the state," and that amongst other things desired to be accomplished by the publication of this account was the mining of those ores and the establishment of iron manufactories in the state. It is the contention that the legislation in question, in so far as it related to manufacturing establishments, had in view this same end. But the legislation is not legislation favoring any manufacturing establishment, as legislation exempting from taxation does. It is legislation favoring the employés of the manufacturing establishments to whom it relates and persons who furnish them materials and supplies. In the former particular it is in line with legislation everywhere. It is rather unique in favoring persons who furnish materials and supplies. Why, then, should the Legislature single out the employés of and persons furnishing materials and supplies to iron manufacturers for so favoring, and omit to favor the employés of and persons furnishing material and supplies to other manufacturers? No conceivable reason occurs to me for making such a distinction. Such a limitation is so unreasonable as to be of itself a consideration against the application of the rule in this instance. Besides, though at the time of the original enactment of the statute it seems to have been thought that there were such beds of iron ores in various parts of the state which it was desirable to have mined, it has long since been ascertained that such beds as there are are not capable of being profitably mined. If there is now, or for many years has been, any iron ore mining in the state, I am not informed as to it. And since this condition of things has been definitely ascertained, the original statute has been twice re-enacted. It was re-enacted in 1893, at the long session of the Legislature after the adoption of the present Constitution of the state, and again, on February 29, 1904, by the adoption of Carroll's 1903 Edition of the Kentucky Statutes.

But there is a conclusive consideration against limiting the statute as is claimed on behalf of the respondents it should be. The decisions so cited which apply the rule of ejusdem generis recognize that it should not be applied where there is something in the context against its application. There is something in the context of this statute which shows beyond question that it was the thought of the Legislature to include all manufacturing establishments. The article containing the statute and other relevant provisions is entitled as follows:

"Railroads, Other Improvements and Manufacturers—Liens of Employés and Others on."

This title is not simply the work of the compiler of the Kentucky Statutes. It is the work of the Legislature also. It became so by the adoption in 1904 of Carroll's 1903 Edition of Kentucky Statutes as above stated. In this title occurs the general word "Manufacturers," without any limitation whatever. It clearly indicates that it was the thought of the Legislature to include in the following statutory provisions all manufacturers whatever.

207 F.—11

I have thus far considered the question as one of principle, without reference to the effect thereon of any relevant decisions. I have so done, because it is the contention of respondents that the question has not been foreclosed by any such decision, but is still an open one. The relevant decisions are not few in number. They are as follows: Winter v. Howell, 109 Ky. 163, 58 S. W. 591; Bogard v. Tyler, 119 Ky. 637, 55 S. W. 709; Muir v. Samuels, 110 Ky. 605, 62 S. W. 481; Graham v. Magann Lumber Co., 118 Ky. 192, 80 S. W. 799, 4 Ann. Cas. 1026; Hall & Son v. Guthrie's Sons' Assignees (Ky.) 103 S. W. 721; In re Falls City Shirt Manufacturing Company (D. C.) 98 Fed. 592; In re Bennett, 153 Fed. 673, 82 C. C. A. 531; In re Starks-Ullman Saddlery Co., 171 Fed. 834, 96 C. C. A. 506. In no one of these cases was the manufacturing establishment in question an iron manufactory. In Winter v. Howell it was an establishment where mixed paints and cut-offs for cisterns were made; in Bogard v. Taylor and Graham v. Magann Lumber Company, a sawmill; in Muir v. Samuels, a laundry; in Hall & Son v. Guthrie's Sons' Assignees, a flour mill; in Re Falls City Shirt Manufacturing Company, a shirt manufactory; in Re Bennett, a barrel factory; and in Re Starks-Ullman Saddlery Company, a horse leather factory. In the cases of Winter v. Howell, Bogard v. Tyler, Muir v. Samuels, and Re Starks-Ullman Saddlery Company the lien claimed under the statute was denied. But it was not denied on the ground that the establishment in question was not a manufacturing establishment within the meaning of the statute, except in Muir v. Samuels, and it was so denied there, not on the ground that it was not an iron manufactory, but on the ground, as we have seen, that a laundry is not a manufacturing establishment. It was assumed that the statute covered all manufacturing establishments. In the other four cases there was no question that the establishment was a manufacturing establishment. In each of them, except Bogard v. Tyler, it was assumed that the statute covered all manufacturing establishments, and hence the particular establishment involved therein. In Bogard v. Tyler the question was expressly raised and determined that the statute covered a sawmill. Judge Du Relle said:

"Numerous questions are made as to the proper construction of the act of February 25, 1893, relied on as giving a lien in favor of the employés and materialmen. These questions, however, in our view, need not be considered, except the question whether the statute applies in this case. The lien being statutory, all the conditions upon which it is predicated must exist. There must be a manufacturing establishment; and, under the evidence in this case, as the sawmill was engaged in manufacturing lumber for the market, we think there was."

He then stated the several contingencies on which the lien under the statute was to attach, and held that none of them had happened. It was on this ground alone that the lien was denied. In Winter v. Howell the lien was enforced in the lower court to a certain extent. All the Court of Appeals did was deny its enforcement to any greater extent. In the cases of Graham v. Magann Lumber Co., Hall & Son v. Guthrie's Sons' Assignees, In re Falls City Shirt Manufacturing Company, and In re Bennett the lien was enforced. In none of them,

except in that of Hall & Son v. Guthrie's Sons' Assignees, was the question raised as to whether the statute covered the particular manufacturing establishment therein involved. In the other three cases it was simply assumed that it did. In the case of Hall & Son v. Guthrie's Sons' Assignees, the question was raised as to whether the statute covered a flour mill and it was decided in the affirmative. Judge Nunn said:

"The mill of Guthrie's Sons was a manufacturing establishment in the meaning of this section. In the case of Muir v. Samuels * * * this court determined that a laundry was not a manufacturing establishment in the meaning of that section, for the reason that it only changed dirty linen into a clean linen. The article was a complete one before and after it was laundered. In the case of Bogard v. Tyler * * * it was held that a sawmill was a manufacturing establishment, because it manufactured lumber from logs. The mill in this case changes wheat into flour."

The ground upon which it is claimed that the decisions in these four cases do not foreclose the question is that it was not claimed in any one of them that the rule of ejusdem generis applied, and, applying it, the statute should be limited to iron manufactories, and hence this precise question was not decided. In order for a prior decision to be a precedent as to any question, it is argued that it must be raised and decided. It is not sufficient that it was directly involved. In the case of Celluloid Manufacturing Company v. Tower (C. C.) 26 Fed. 451. Judge Carpenter said:

"No decision, as it seems to us, can amount to a precedent unless made after full argument."

In the case of Carroll v. Lessee of Carroll, 16 How. 275, 14 L. Ed. 936, it was said:

"There must have been an application of the judicial mind to the precise question necessary to be determined."

And in the case of Boyd v. Alabama, 94 U. S. 645, 24 L. Ed. 302, it was held that a court was not precluded, by having enforced a statute, from thereafter considering its constitutionality.

But I think that the fact that in Bogard v. Tyler the question as to whether a sawmill, and in Hall & Son v. Guthrie's Sons' Assignees the question as to whether a flour mill, was a manufacturing establishment within the statute was expressly raised, and so determined, though the bearing thereon of the rule of ejusdem generis was not suggested or considered, makes them binding precedents in support of the position that the statute covers all manufacturing establishments. I do not think that Judge Lurton, in the case of In re Starks-Ullman Saddlery Company, recognized the question as open and undetermined. Priority was there denied, because the indebtedness was not incurred on the manufacturing side of the bankrupt's business. On the contrary, it does not seem to have occurred to Judge Lurton that there was any question as to the statute not covering all manufacturing establishments. He said:

"The statute is plain enough. The purpose is to give a lien under certain circumstances to persons furnishing materials and supplies for the carrying on of the manufacturing business in which the debtor was engaged. * * *

The statute was before us in the case styled In re Bennett, 153 Fed. 673 [82 C. C. A. 531]; but the claims then involved were undisputably for materials and supplies, furnished for the carrying on of an undisputable manufacturing business."

But how does it happen in all these cases it never occurred to the lawyers or the court that the statute could have a limited meaning in this particular? It can be accounted for on two grounds: One is the use of the unlimited word "manufactures" in the title, and the other is the total absence of any reason for limiting a statute favoring employés and materialmen to iron manufactories. The latter consideration was sufficient of itself to prevent its occurring to them that the statute could have such a limited meaning. It would have been unreasonable to so limit it.

I am therefore clear, both on principle and authority, that the statute is not limited to iron manufactories. The order of the referee is therefore reversed, and the cause remanded, with directions to give priority to the petitioning creditors.